(No. 11509.—Reversed and remanded.)

JORGEN P. HANSEN, Appellee, vs. E. J. GAVIN, Appellant.

*Opinion filed October 23, 1917.*

1. CONTRACTS—*contract will not be rescinded merely because one party has the advantage.* The fact that one party gets the advantage of the other in a transaction by the wording of the contract is not sufficient ground, of itself, for setting aside the contract, where the other party is apprised fully of the provisions of the contract and what they mean.

2. SAME—*party desiring to rescind contract on ground of fraud must act upon discovering the fraud.* Where a party desires to rescind a contract upon the ground of fraud, he must, upon the discovery of the fact, at once announce his purpose and adhere to it, and it is his duty to tender back whatever he has received under the contract and offer to place the other party *in statu quo.*

APPEAL from the Circuit Court of Grundy county; the Hon. SAMUEL C. STOUGH, Judge, presiding.

F. A. ORTMAN, F. H. HAYES, and L. M. SHELLY, for appellant.

J. W. RAUSCH, and CLYDE H. THOMPSON, for appellee.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

This appeal is prosecuted by appellant, E. J. Gavin, from a decree of the circuit court of Grundy county setting aside two contracts for the sale of real estate and a warranty deed executed by appellee to appellant, ordering the cancellation of a note for $1000 executed by appellant to appellee, a note for $580 executed by appellee to appellant for the rent of said premises for one year, the return to appellant of seventeen one-thousand-dollar notes and a mortgage on said premises securing the same, executed by appellant to appellee, and $84.49 paid by him as taxes on said premises. The bill was filed by appellee and charged appellant with fraud in the execution of said contracts. Ap-

pellant by his answer denied the allegations of fraud, and charged that appellee is estopped from claiming the relief prayed for in his bill by his ratification of said first contract and the execution of said second contract after he had full knowledge of the facts alleged as constituting the fraud relied on in his bill to justify the relief thereby sought.

The facts that appear from the record to be uncontroverted are, that on July 25, 1913, appellee entered into a written contract with appellant for the sale of the land on which appellee was then living with his family, about two miles south of the village of Gardner, in Grundy county, described in the contract as the north half of the northeast quarter of section 21, town 31, north, range 8, east of the third principal meridian. The contract provided that appellant should pay for the land the sum of $21,600, $1000 to be paid in cash, $3600 on March 1, 1914, and the remainder of said purchase price to be secured by a first mortgage on the premises for a period of five years from said last date, with interest at the rate of five per cent per annum, and appellant was to pay all taxes and assessments legally levied on said land subsequent to the year 1913. In a subsequent clause of the contract the following words were written: "It is further understood and agreed to be at the option of the party of the second part [appellant] or his assignees to choose, on or before March 1, 1914, either the above mentioned manner of settlement for said land or to pay for the same in the manner following, namely, by payment on March 1, 1914, the sum of $3600, and the balance of said purchase price to be secured by a first mortgage for $17,-000, drawn to provide the privilege of paying the sum of $1000, or any multiple thereof, without interest, on the first day of March of each year thereafter until paid. Sixty days' notice of any payment on mortgage shall be given first party." The two clauses above set forth will be referred to hereafter in this opinion as the first clause and the option clause of the contract. Appellee is a farmer,

who came to this country about twenty-five years ago from a province of northern Germany, formerly a part of Denmark. He and his wife are Danes, and as appears from the record did not thoroughly understand the English language. A son and daughter of appellee, both about grown and educated in the common schools of this country, were present and witnessed the contract above described. Appellant was a real estate agent of Pontiac. Shortly after the contract was entered into he asked appellee to do the fall plowing on said premises. Appellee proposed to appellant to rent the land from him for the following year, and appellant finally agreed that he would rent it to appellee for $580 for the year, on condition that appellee would give him a further extension of time for the payment of the $3600. As a result of the propositions mutually proposed, a second written contract was executed by appellee and appellant and witnessed by N. E. Erickson and Christ Hansen, the latter a brother of appellee, on October 29, 1913, which contract is as follows:

"In consideration of mutual benefits, the parties to the contract hereto attached, the same being a contract for warranty deed bearing date of July 25, 1913, for the following described land: The north half (½) of the northeast quarter (¼) of section twenty-one (21), township thirty-one (31), north, in range eight (8), east of the third principal meridian, county of Grundy and State of Illinois; hereby agree that the time of settlement as provided for in the original contract hereto attached be extended as herein provided. First party to execute a deed forthwith, and place same, together with all other papers pertaining to said land, in the Pontiac State Bank at Pontiac, Illinois, and the second party shall then execute a mortgage in the sum of $17,000 in accordance with the original contract hereto attached, and same shall be placed in said bank, and said bank shall hold said papers in escrow until proper time of delivery to authorized parties. The second party agrees to pay

into said bank for first party, on or before March 1, 1915, the sum of $3600, with interest thereon at the rate of six per cent from March 1, 1914, and whatever may be due on said $17,000 mortgage, if any, as provided therein. When in receipt of such sum said bank is hereby authorized to deliver said deed and other papers to said second party and said mortgage and money to said first party. First party is to have lease of said land for the year 1914 for the sum of $580 and has this day given the said second party note for said sum; said note due March 1, 1915, without interest if paid when due. Said second party agrees to pay land tax on said land for the year 1914. It is further agreed that this extension is conditioned upon the respective parties complying with all of the terms of said extension, and in case said parties fail to execute the papers and deliver the same to the Pontiac State Bank as provided in this extension then it shall be of no force and effect, and said original contract, which is hereto attached, shall be binding upon the respective parties hereto, and said first party shall forfeit said note of $580 if said deed is not placed in said bank by November 10, 1913."

It further appears from the record that appellee executed his warranty deed to appellant in accordance with the provisions of the second contract and placed it and his abstract of title to the land in the Pontiac State Bank on November 8, 1913. Appellant executed his mortgage on said premises securing seventeen notes of $1000 each, one of which became due each year without interest, the last note falling due seventeen years after the date of said notes. The mortgage and notes were in the bank at the time appellee took his deed and abstract there, and the cashier informed him the notes did not draw interest, and showed him the notes and mortgage. Subsequent to that time, and prior to the filing of the bill in this case, the appellee and his brother, Christ, called at said bank and examined the papers, the cashier again explaining the notes and mortgage

to them. On January 21, 1914, appellant sent appellee a letter by registered mail, in which he wrote:

"I am writing this to let you know that I have elected to pay for the farm which I bought of you as outlined in the second option given me in your contract, viz., by paying you $3600 cash on March 1, 1915, and executing mortgage for $17,000, $1000 of which is to become due each year for seventeen years as provided in the contract, and I have accordingly made and executed said mortgage and notes and delivered same to the Pontiac State Bank, to be held for you with the rest of the papers in accordance with the contract. If agreeable to you I will be glad to change notes with you on March 1. If you will send your $1000 note which you hold against me to the Pontiac State Bank I will cancel your $580 note and pay the bank the difference, which they can send to you."

It appears that on the date the first and original contract was entered into appellant executed to appellee his note for $1000, due March 1, 1914, which appellee held at the time the second contract was executed and which is the note referred to in appellant's letter just quoted, and that that note represented the $1000 cash that was to be paid by appellant on the land. Appellant also deposited in said bank, along with said mortgage and notes, $1000 in cash to take up said first note.

In support of his contention that the option clause was not read to him at the time the contract was executed, appellee testified that appellant came to his farm about a week before the contract was made; that he asked appellant $270 an acre for the land; that appellant came back in July and they talked about the contract; that appellee wanted $1000 cash, $3600 to be paid within one year and $17,000 to be paid in five years, with five per cent interest; that appellant agreed to it but wanted longer time, which appellee refused to give; that appellant then wrote out the contract in duplicate and read it over in the presence of appellee and

his son and daughter, appellant having one of the contracts, the other lying on the table while he read; that he heard all the contract read by appellant except the option clause, which he denies hearing appellant read. He testified further, in substance, that after the contract was signed appellant laid it down on the table, rubbed it and wrote in it, but did not read to appellee nor tell him what he had erased or written after the reading; that he would not have signed the contract if he had known of the option clause in it; that in September, 1913, he went to Pontiac to see appellant and told him that he would take the farm back, and that appellant replied that if he should want to sell it he would give appellee the first chance to buy it back; that on the following Saturday he went to John Barton's office, in Gardner, to meet appellant, with whom he had an appointment on that date, but that appellant did not appear; that he took the contract, which had been signed on July 25, 1913, with him to Barton's office, which was prior to the signing of the second contract; that he showed the contract to Barton, a justice of the peace, who read it, explained how much money and at what times the money would be due under the contract, figured up the interest but did not tell him that the notes would run seventeen years without interest. In relation to the execution of the second contract appellee testified, in substance, that both the original and second contracts were read over the day the second contract was executed, in the presence of his brother, Christ, except the option clause, and that nothing was said about it.

N. E. Erickson, who was also a Dane and called as a witness on behalf of appellee, testified, in substance, that he was at the home of appellee on October 29, 1913, and heard both the original contract and supplemental contract read at the request of appellee, in the presence of appellee, his wife, son and daughter and appellee's brother, Christ, but that he didn't hear the option clause read. He further testified that although he was a Dane he could only speak

one language, the English language. He admitted on cross-examination that at the request of appellant and appellee he took the copy of the original contract and followed appellant while he was reading it aloud to all present, and that after it was read he told appellee that he saw nothing wrong with it. He further testified that appellee said on that occasion that he had shown the contract to Barton, and that Barton had found in the contract the clause that the mortgage and notes were to run seventeen years without interest, and that Barton said that it wasn't a fair contract and that he thought it ought to be changed, and that appellee repeated that conversation at that time. It also appears from the evidence that Erickson was himself a real estate man.

Christ Hansen, appellee's brother, testified, in substance, that he went to his brother's place in answer to a telephone call from his wife and saw appellant and Erickson, with appellee and his wife, son and daughter; that he heard the original contract read that day by the appellant except the option clause, which he did not hear him read; that the second contract was also read, and that Erickson held the copies while appellant read the originals. He further testified that he saw both of the contracts himself and had them in his hands, and that his brother told him that he wanted him to look over the papers; that he understands the English language better than appellee, and that he never heard appellee say that the contracts were not satisfactory to him after they were read; that he made two trips to the bank with his brother, the appellee, to examine the papers placed in the bank by appellant.

Nels S. Hansen, the son, and Methe Hansen, the daughter, both corroborated appellee in his testimony concerning the reading of the original contract when it was first drawn, and both testified that appellant did not read over the option clause at said time. They also both testified that their father went to see Barton, the justice of the peace, and the

son testified: "My father said there was something wrong with the contract when defendant came to draw the second one. He said he had showed it to Barton." They both testified that they signed the contract as witnesses, and that they both understand the English language and can read and write it. The daughter further testified that after appellant and her father had signed the contract each took his copy and folded it, and that her father sat with his in his hand, with the note given for the $1000; that appellant took the contract and rubbed something and wrote in it about three-fourths of the way down the page. On being shown the contracts at the trial she testified that they were practically in the same condition as when they were read over on the day they were signed, and that her father told her and her brother to look at the contract while appellant was reading it; that they both stood there with the copy while the appellant was reading the original, and that afterwards her father took his contract and put it away with his papers. She also testified that her father had some figures made by himself and some made by Barton, and on cross-examination with reference thereto the following questions were asked her and to which she gave the answers here following, to-wit:

Q. "They had some figures there, [October 29, 1913,] didn't you say, at home?

A. "They had some figures just like what he made and they had some figures made in Barton's office.

Q. "Your father and John Barton? They were doing some figuring in Barton's office?

A. "Yes.

Q. "They were your father's own figures?

A. "Yes, his own handwriting.

Q. "When did your father make those figures?

A. "Before the 29th of October.

Q. "Where are those figures now?

A. "I don't know.

Q. "What were those figures?

A. "I can't just remember. I have seen them, and Barton had some figures, and I don't know where he got them.

Q. "Now, when your father came back from John Barton's office, was he still satisfied with the contract or dissatisfied?

A. "You might know my father wasn't clearly satisfied if he would be out the interest. But he didn't say for how much. He said as far as he could see—my father said he thought he couldn't see right then."

Appellant testified, in substance, that he and appellee talked over the contract before an agreement was reached and discussed the terms and payments, and that the matter of paying for the land in sums of $1000 a year, without interest, was discussed, and that he said to appellee, "I figure that if I pay you $270 an acre and pay $1000 a year that I am paying enough without paying interest;" that appellee said, "I wouldn't like to do that; I would rather sell it the other way;" that he then said to appellee: "I don't care about buying your place, and if you would rather sell the other way I would suggest this to you: that we put in the contract the terms on which you say you would like to sell the farm and we will also put in the contract the terms on which I tell you I am able to buy the farm, and if I can sell this place to some one else before March 1 that will take and settle for it according to the way you want to settle I will do what I can do that way, but if I have to settle for the place I will have to take it according to the way I have outlined to you;" that appellee talked to his wife, and then said all right—he was willing to do that. Appellant also testified, in substance, that after he had written the contract the son and daughter were called in to witness it; that he (appellant) read the contract while the son and daughter followed the reading in the copy to see that they were alike, and that when he came to the words "option" and "subsequent" in the contract he explained their mean-

ing to appellee. He further testified that appellee came to his office October 23, 1913; that appellee said he had been to see Barton; that appellee wanted to rent the farm in question and offered to give appellant $580 cash rent, and agreed in consideration thereof to extend the time to appellant on his payment of the $3600, which was payable March 1, 1914, according to the terms of the contract, but said, "There is something not right with the contract;" that appellee said he had talked with a lawyer in Dwight about the contract and the lawyer told him it ought to be changed so that it would be more in his favor, and that Barton said the contract ought to be drawn over; that when he (appellant) went to appellee's home on October 29, 1913, with Erickson, to close up the lease, appellee said: "There is something wrong with that contract. I was in Gardner and showed it to Barton, and Barton said there is no place in that contract where it says interest. He said he found a clause in there seventeen years without interest." Appellant then narrated the circumstances connected with the execution of the supplemental contract and his reading over both the original and the supplemental contracts, and that Erickson held appellee's copies of the contracts and read them after him, and that he (appellant) read over all the contracts, and the writing is the same as when they were signed.

There was no specific or other denial of appellant's testimony by appellee other than as has already been related, to the effect that appellee had talked the matter over with a lawyer in Dwight and with Barton, and had learned all about the provisions of the original contract before October 29, 1913, when the second contract was executed. In other words, it appears clearly from the testimony of appellee's own witnesses and the testimony of appellant that appellee was apprised of the exact provisions of the original contract before he signed the second contract. Moreover, the original and duplicate contracts executed in July,

1913, were certified to this court as original evidence, and each contained the option clause apparently without erasures or blots, and all the witnesses practically agree that they are in the same condition as they were when signed by the parties.

Several witnesses testified for appellee that the land was worth $270 or more an acre when purchased by appellant. An equal number of equally credible witnesses called on behalf of appellant testified that the land was worth from $185 to $200 an acre. All of the witnesses practically agreed on the fact that the east forty acres of the land was thin soil, and that with deep plowing clay would be plowed up, which would cause the crops to burn in dry weather. It further appears from the testimony that there were three roads, one on each of three sides of the land, that took off four acres, leaving only seventy-six acres. It also appears from the evidence that appellant contracted at a very low rate of rental for the year 1914 in order to secure the benefit of the extension of time granted by appellee. From the reasons assigned by the various witnesses and from facts given by them upon which they based their valuations of the land, we are convinced that the weight of the evidence is that the land in question was not worth to exceed $200 an acre at the time the contracts were made. From the opinion of the trial court appearing in the record it also clearly appears that it was the opinion of that court that the land was not worth to exceed $200 an acre. It also appears from the opinion of that court that it was the judge's deliberate judgment that the evidence showed that appellee was thoroughly apprised of the provisions of the original contract at the time he signed the second contract. We can not understand from the evidence how any other rational conclusion could have been reached, and we are clearly of the opinion that the court erred in not setting aside the findings of the master. It is probably very true that appellee did not comprehend or was not able to calculate just

how much he would be affected by the long-term payments of the $17,000 without interest. It is doubtless true that appellant drew the contract in the language it is drawn for the purpose of getting the better of appellee in the contract. The fact, however, that one party gets the advantage of the other in a deal by the wording of the contract is not sufficient ground, of itself, for setting aside the contract, and particularly where the other party is apprised fully of the provisions of the contract and what they mean. It clearly appears from the evidence that appellee knew at the time he signed the second contract that $17,000 of the purchase money was only to be paid $1000 a year for seventeen years, and without interest, if appellant chose to exercise what was called his option in the contract. He must be presumed to know that the appellant would exercise such choice unless he found a buyer who would buy the land at a profit to appellant. Appellee also evidently knew that his land could not be sold for anything like the sum of $270 an acre on a cash basis. The evidence shows very clearly that he expected appellant to take the land under the option clause, and he made figures on that basis, and made his conclusion to ratify the original contract notwithstanding other parties had advised him that it was an unfair contract. There is no evidence of fraud anywhere upon the part of appellant in the execution of the second contract. The execution of that contract must be considered as a ratification of the original contract for the reasons aforesaid.

Where a party desires to rescind a contract upon the ground of fraud, he must upon the discovery of the fact at once announce his purpose and adhere to it. "He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted." (*Greenwood* v. *Fenn*, 136 Ill. 146.) Suit was not brought in this case until February 21, 1914, long after the discovery and ratification of the original contract alleged to have been fraudulently obtained, and the evidence does not show that

any notice was given of an election or determination to set aside the contract before that suit was brought. Moreover, it was the duty of appellee, even if he was entitled to a rescission of the contract, to have tendered back what he had received thereon and to have offered to place appellant *in statu quo.* Appellee made no offer before the bill was filed, or at any time thereafter, to tender to appellant the $1000 note in his possession, or to re-pay him the taxes he had paid on the land, or to deliver up the notes and mortgage placed by appellant in the bank for appellee. His failure so to do is fatal to his right of recovery in this case. *Brady* v. *Cole,* 164 Ill. 116.

The decree of the circuit court is reversed and the cause is remanded, with directions to dismiss the bill for want of equity.            *Reversed and remanded, with directions.*