Charles B. O'Donnell, et al. vs. The Snowden & Mc-Sweeney Company, Appellee.—(James M. O'Donnell, et al. Appellants.)

*Opinion filed October 28, 1925.*

1. Leases—*an oil lease creates no confidential relation between parties—accounting.* There is no relation of special trust or confidence between the lessor and lessee in a gas or oil lease any more than in any other contract but the parties deal at arm's length each for his own interest, and the fact that the lessee has the best of the bargain does not give rise to a suit for an accounting in equity upon discovery of the fact that the lessee is receiving more profit out of the agreement than was contemplated.

2. Same—*oil lease is construed as any other contract.* A contract between parties dealing in oil and gas, such as an oil lease, is subject to the same rules of interpretation as any other contract, and it must be construed as a whole and the intention of the parties collected from the entire instrument and not from some detached portion.

3. Contracts—*when fiduciary relation exists.* A fiduciary relation exists where there is a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence.

4. Accounting—*when finding of the chancellor will not be disturbed.* Where the chancellor makes a finding of fact from conflicting testimony heard by him in a suit for an accounting, his finding will not be disturbed on review unless it is clearly against the preponderance of the evidence.

Appeal from the Appellate Court for the Fourth District;—heard in that court on appeal from the Circuit Court of Lawrence county; the Hon. Charles H. Miller, Judge, presiding.

Shaw & Huffman, and Kramer, Kramer & Campbell, for appellants.

Gee & Gee, A. M. Gee, and Paul Speer, for appellee.

Mr. Justice Thompson delivered the opinion of the court:

A certificate having been granted by the Appellate Court for the Fourth District allowing an appeal from its judgment in this case affirming a decree of the circuit court of Lawrence county, there is presented for our consideration the record and the errors assigned thereon. The decree affirmed denied the relief asked and dismissed for want of equity a bill filed by appellants, the lessors in an oil and gas lease, against appellee, the lessee in the same lease, charging that appellee is by a steaming process skimming the gasoline from the oil produced on the lands of appellants, thereby depriving appellants of royalty due them. There was a prayer for an accounting and for an injunction against the further operation of the steaming plant.

The evidence is somewhat voluminous and on the points vital to a decision of the case is directly contradictory. It can subserve no useful purpose to reproduce the evidence here in detail. We have read it all and shall state only our conclusions drawn from it.

The principal testimony on behalf of appellants is that of four chemists. They testify that they have been employed in the southern Illinois oil field for many years and that they are familiar with the kind of oil produced on the O'Donnell farm; that this oil is about twenty-two per cent gasoline, which is the most valuable part of the oil; that the higher the gravity of oil the more gasoline properties it contains and the greater its value; that the gravity of the crude oil produced on the O'Donnell farm is about 32; that the gravity of the oil in the shipping tanks after it has passed through the steaming plant is about 29; that by the process of steaming used by appellee on the O'Donnell farm from eight per cent to eleven per cent of the volume of the crude oil is removed and from thirty-six per cent to forty-six per cent of the gasoline properties of the oil is removed;

that in warm weather, if the oil produced on this farm were allowed to stand in the storage tanks for a week, the water and other foreign substances would settle and could be drawn from the bottom of the tank by a siphon or otherwise; that in cold weather it will settle if heated to summer heat, and that it will never be necessary to heat it above 150 degrees Fahrenheit; that if the oil is heated by turning steam into the water at the bottom of the tank gasoline evaporation will commence at 187 degrees, and that if the oil is heated by running the steam through the bottom of the tank in pipes and discharging it outside the tank it can be heated to 200 degrees before the gasoline is discharged; that heating the oil by injecting live steam into the water at the bottom of the tank emulsifies the water and oil and is of no assistance in settling the water and foreign substances; that the equipment used by appellee is not adapted for settling purposes but is a skimming plant for taking the gasoline from the oil. Appellants also produced some witnesses who were producing oil in the southern Illinois field who testified that the water settled out of their oil without the application of heat to the storage tanks except in very cold weather, when the heat applied did not exceed 120 degrees Fahrenheit. None of appellants' witnesses had ever been employed on the O'Donnell lease. The testimony of the chemists is based largely upon an experiment made by testing in the laboratory a small sample taken from the receiving tank, which contains the oil as it comes from the wells on the O'Donnell farm, and another small sample taken from the shipping tank, which receives the oil from the steaming tank after it is ready to be turned into the pipe lines for transportation to the oil refiners.

Appellee produced seventeen witnesses, all of whom were or had been actively engaged in producing oil on the O'Donnell lease, some of them for more than ten years. The testimony of these witnesses shows that the oil produced on the O'Donnell farm is from Buchanan sand; that

it is a heavy oil, and that it is necessary to heat it to cause the water and other foreign substances to settle so that the oil can be delivered into the pipe line for transportation to the refiners; that a series of experiments were conducted by appellee on this lease to determine whether the water would settle without heating, and with heating at various temperatures, ranging from 120 degrees to 200 degrees Fahrenheit; that these experiments showed that merchantable oil could not be produced on this lease until it was heated to about 185 degrees Fahrenheit; that the oil produced has been steamed throughout the life of the lease, from 1907 down to date; that it was discovered in 1913 that the steaming process was causing a part of the gasoline to go off in fumes, and arrangements were thereafter made to capture it; that the steaming process was not materially changed after appellee decided to save this gasoline which had theretofore been lost; that the only difference in the equipment was the installation of inclosed steel steaming tanks, designed to capture the gasoline fumes that were given off in the steaming process; that the system used by appellee is the usual and ordinary one used for rendering merchantable oil like that produced on the O'Donnell farm; that the system is the correct system and that the oil on the O'Donnell farm cannot be rendered merchantable with less heating.

The oil and gas lease was made by appellants in 1906. In 1914, when the parties decided that the gasoline being lost should be saved, a supplemental agreement was entered into, which recited that after the oil produced under the original lease is stored in tanks upon the premises it is subjected to a process of steaming in order to prepare it for delivery to the oil refiners, and by this steaming process a part of the gasoline is freed from the oil. It also recites that a certain amount of natural gas, known as casing-head gas, which is useful for the manufacture of gasoline, is escaping from the oil wells on the premises. The agreement

then provides that appellee shall provide equipment for securing, preserving and marketing this gasoline which would otherwise be wasted, and that it shall compensate appellants for this product by an annual payment of $550. As present consideration for the execution of the supplemental agreement appellee conveyed to appellants a one-eighteenth interest in the land leased, which it had secured from an heir owning that portion of the fee who had not signed the lease, and it released appellants from all obligation to reimburse it for $11,307.49 paid out to settle the claim of this heir, and it also agreed to defend any future claim made by or on behalf of this heir.

Much of appellants' brief is devoted to an argument based on the assumption that a fiduciary relation existed between the parties to the supplemental agreement of 1914 and that appellee overreached appellants in making the agreement. There is no relation of special trust or confidence between the lessor and lessee in a gas or oil lease any more than in any other. (*Colgan* v. *Forest Oil Co.* 194 Pa. St. 234, 45 Atl. 119.) Like all other contracting parties, they deal at arm's length, each for his own interest. The mere act of making the contract does not constitute proof of a fiduciary relation. (*Bordner* v. *Kelso,* 293 Ill. 175.) The relation exists where there is a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence. (*Niland* v. *Kennedy,* 316 Ill. 253.) In this case there is no evidence whatever of a confidential relation existing between the parties, and if there was, the record is entirely barren of evidence showing that appellee exercised any influence whatever in securing the supplemental agreement. The record shows that it merely represented the facts to appellants and offered them the opportunity to settle all past disputes regarding the title to the land and all future disputes regarding the saving of gasoline then being wasted. If the con-

tract authorized the steaming of the oil as it is now being done there is no case for an accounting though appellee got the best of the bargain. (*Hansen* v. *Gavin,* 280 Ill. 354.) At the time this agreement was made no one knew how much gasoline could be saved, and at that time no one could tell which party would profit the more.

A contract between parties dealing in oil and gas is, of course, subject to the same rules of interpretation as any other contract. (*Hammett Oil Co.* v. *Gypsy Oil Co.* 95 Okla. 235, 218 Pac. 501.) The contract must be construed as a whole and the intention of the parties collected from the entire instrument and not from some detached portion. (*Wolf* v. *Blackwell Oil and Gas Co.* 77 Okla. 81, 186 Pac. 484; *Chicago Home for Girls* v. *Carr,* 300 Ill. 478.) There is no ambiguity in the contract before us. Without question, it was understood by all parties that it was necessary to steam this particular oil in order to render it marketable, and it was also understood that in the steaming process a certain part of the gasoline was being lost. With these facts in mind, the parties entered into the supplemental agreement of 1914, authorizing appellee to save the gasoline then being wasted and fixing the compensation for appellants' share.

The only debatable question presented by this record is whether appellee is breaching the contract and by applying too much heat to the oil robbing it of its most valuable element. On this question the evidence is in direct conflict. The chancellor saw and heard the witnesses and was in a much better position than we are to form an opinion of the relative merit and weight of the testimony given by the several witnesses. Where the chancellor makes a finding of fact from conflicting testimony heard by him, his finding will not be disturbed on review unless it is clearly against the preponderance of the evidence. (*Schrader* v. *Schrader,* 298 Ill. 469; *Fabrice* v. *Von der Brelie,* 190 id. 460; *Coari* v. *Olsen,* 91 id. 273.) Our examination of the evidence

confirms the conclusion reached by the chancellor. The evidence shows that the oil on the O'Donnell farm is being heated the same as it was before the supplemental agreement of 1914 was made and before the equipment for saving the escaping gasoline was installed. Under the original lease seven-eighths of the oil belongs to the appellee and one-eighth to appellants, and it is inconceivable that appellee, by unnecessarily steaming the oil before the equipment to capture the escaping fumes was installed, would have wasted gasoline when the loss would fall on it seven times heavier than on appellants. The latter having failed to produce the evidence to establish the allegations of their bill the chancellor properly dismissed it for want of equity.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*