## GEARY et al. v. ADAMS OIL & GAS CO.
### No. 110.

District Court, E. D. Illinois.

Feb. 1, 1940.

C. M. Raemer, of Salem, Ill., for plaintiff.

H. G. Gwinnup, of Houston, Tex., and Baker, Lesemann, Kagy & Wagner, of E. St. Louis, Ill., for defendant.

WHAM, District Judge.

In this suit the plaintiffs, hereinafter sometimes referred to as the "Geary heirs," seek to recover damages from the defendant, Adams Oil and Gas Company, for alleged failure on the part of the defendant properly to fulfill its obligations, as lessee, to plaintiffs, as lessors, under the terms of an oil and gas lease upon a tract of land containing approximately twenty acres owned by said Geary heirs, the legal description of which appears in the complaint. Plaintiffs also seek an annulment of said lease upon the same grounds. Plaintiffs base their complaint upon the alleged failure of the defendant to comply with implied covenants of the lease to protect the plaintiffs against loss by drainage of oil from beneath plaintiffs' land through wells drilled on adjoining lands. Defendant's answer is two-fold. First, that the implied covenants relied upon by the plaintiffs have been replaced in the lease by express covenants and conditions which specifically define the number of wells defendant may be required to drill upon plaintiffs' land and that defendant has fulfilled such express conditions. Second, that, in any event, defendant is not required, under the law, or implied covenants in the lease, to drill more wells than it has for the reason that to do so would require the defendant to sustain a loss in that the cost of drilling, equipping and operating one or more additional wells would be greater than the value of the oil that could be so produced. The answer also renews the motion to dismiss the complaint on the ground of insufficiency, which motion was heretofore denied when presented before answer filed.

The pertinent facts shown by the evidence are as follows: The Geary tract, which lies immediately west of the City of Centralia, Illinois, is rectangular in shape, approximately one-quarter of a mile east and west and one-eighth of a mile north and south. Its eastern boundary is adjacent to the western boundary of the City of Centralia, a public street separating it from the city blocks and lots into which this portion of the city is divided and subdivided. Lying immedately north of said tract along its entire boundary is the Hefter tract of sixty acres. Along its entire south boundary is a narrow strip of land belonging to one J. Klein, the eastern portion of which is only one hundred thirty feet in width from north to south. South of the Klein tract is the Stead tract of considerable area.

At the time the defendant took the lease upon the Geary tract on January 29, 1938, it held the leases on the Hefter tract on the north and the Klein and Stead tracts on the south. Other interests held the leases on the city lots lying immediately to the east.

The lease taken by defendant on the Geary land contained the usual provisions of an oil and gas lease and also certain additional provisions. It provided that the lessors should receive one-eighth of all the oil produced and saved. A subsequent clause reserved to the lessors an additional one-eighth of all oil produced until the proceeds of the additional one-eighth should amount to $1,000. As further consideration, plaintiffs were paid $2,500 in cash at the time the lease was taken. The evidence shows that the additional $1,000 has been paid in full and that the entire consideration agreed upon was an adequate consideration for the lease. The lease provided that the lessee should commence operations for the drilling of a well on or before March 1, 1938.

At the time the lease was taken the Geary tract consisted of several parcels, or lots, which were separately owned by the various Geary heirs of whom there were eight. The paragraph of the lease governing the assignment of interests in the lease closed with the following sen-

tence: "If the leased premises are now or shall hereafter be owned severally or in separate tracts, the premises, nevertheless, shall be developed and operated as one lease, and all royalties accruing hereunder shall be treated as an entirety and shall be divided among and paid to such separate owners in the proportion that the acreage owned by each such separate owner bears to the entire leased acreage." Then, following intervening paragraphs, appeared the paragraph which defendant contends expressly provides the specific number of wells which defendant may be required to drill and relieves it of any implied covenant further to protect the land from drainage caused by wells on adjoining lands. This paragraph reads: "It is further stipulated and agreed by all parties hereto that the above described land shall be operated and developed by lessee as one communitized lease, with the further understanding that all royalties accruing from production on said property shall be deemed as an entirety and shall be divided equally among the above eight heirs of W. D. Geary and Lois H. Geary, deceased, share and share alike. There shall be no obligation on the part of the lessee to offset the separate tracts into which the property is now divided and a well drilled by the lessee at a regular location (the center of a ten acre tract) which location shall be made by the lessee at a point selected by it, shall be deemed and accepted by the lessors herein as an offset to any and all wells drilled adjoining or adjacent said ten acres. Nor shall the lessee be required to furnish separate measuring tanks by reason of the diverse ownership of the minerals in and under the property communitized hereby."

The defendant contends that the paragraph last quoted specifically relieves it of all implied covenants to drill offset wells and limits the number of wells it may be required to drill to one on the east and one on the west ten acres of the tract regardless of the number of size of the producing wells that may be drilled along its boundaries and despite the fact that defendant owned the leases along the entire north and south boundaries of the lease.

I can not agree with defendant's interpretation of said paragraph. To me the language used in the above quoted sentence and paragraph from the lease clearly indicates that the parties had before them a single unusual problem to be met in the drafting of the lease. This problem grew out of the fact that the tract covered by the lease, being part of an estate, had been divided into several small tracts which were separately owned by the individual heirs who were the lessors. Unless guarded against by specific language, the separate ownership of the lots, operating with the usual implied covenants of an oil and gas lease, would require the defendant to offset a producing well on any such separate tract by a well on each adjoining separately owned small tract, though all were covered by the same lease.

The problem was met by the paragraph of the lease under consideration by providing that the lease should be dealt with as an entirety and a single communitized lease. It so provides in the first sentence of the paragraph and so concludes in the last. To import a foreign subject matter into the intermediate sentence would be calculated to deceive unless couched in language so clear and obvious that it could not be overlooked, or its meaning and full implication mistaken. In my opinion, the paragraph was intended to and does deal with the single problem above mentioned and has no application to nor does it obviate any implied covenants governing the offsetting of wells drilled on lands adjoining the communitized lease.

In dealing with this same contention when presented by defendant in its motion to dismiss before answer filed I used the following language: "The meaning that I am now able to perceive in the written lease, as expressed in the next to the last paragraph therein, is an intention to relieve the defendant from any duty that might otherwise be imposed by law to drill offset wells growing out of separate ownership by the individual plaintiffs of any separate tracts into which the lands covered by the lease may be divided and a purpose to treat the lands covered by the lease as held in a single indivisible ownership." I adhere to this interpretation of the lease. In my judgment, the language of the lease is sufficiently clear to make incompetent and inadmissible and extraneous evidence offered to explain or vary its terms, all of which was received but with ruling as to competency reserved. If I were of the opinion that such evidence were admissible, and all of the evidence on the point that was heard at the trial were given consideration, my conclusions with reference to the meaning of the lease would still remain as above stated.

The foregoing conclusion makes necessary a consideration of the facts bearing on the liability of defendant, if any, to plaintiffs growing out of any failure of defendant properly to protect the lease from drainage by wells on adjoining leases.

At the time the lease was executed on January 29, 1938, no wells had been drilled in the Centralia field proper. The development which had created the immediate interest in the area of the Geary lease was northwest of the city and the nearest producing well was two miles in a northerly direction from the Geary lease. The defendant was then drilling the Hefter No. 1, which was about three-eighths of a mile north of the Geary tract. At the time the Geary well was located it was not known what course the best production from the oil sand that had been discovered northwest of Centralia would take as it came south. The representatives of the defendant who were responsible for making the location of the first well to be drilled on the Geary tract were of the opinion from defendant's geophysical work in the area that the location of the center of the east ten acres would be higher than the location in the center of the west ten acres. This fact, with the fact that to place the well farther east would put it close up to what would probably be a town lot development and the still further fact that defendant intended from the beginning to put but one well on the east ten acres, caused the defendant to locate the well at the approximate center of the east ten acres of the Geary tract. The well was begun February 26, 1938, and was completed and began producing in March, 1938. Up to and including August, 1939, the well had produced 7,718.01 barrels.

Subsequent to the location of the Geary well by the defendant, the defendant located a well on the Klein lease 59½ feet south of the south boundary of the Geary lease and approximately 150 feet east of its southeast corner, which well was completed in July, 1938, and had produced 4,178 barrels up to and including August, 1939. No well was drilled on the Klein lease until after an attempt had been made by defendant to obtain communitization agreement with the lessor in the Klein lease and the lessor in the Stead lease lying immediately south and which would have enabled the defendant to put the Klein well farther south so as to make one well suffice where,

without such agreement, it was necessary to drill one well on the Klein lease and one on the Stead lease to fulfill the conditions of said leases. The defendant made no effort to negotiate an agreement with the Geary heirs by which they would be compensated for the oil drawn from their land by the Klein well which was drilled so nearly on their south boundary. Under the evidence, it is a fair estimate that almost half of the oil produced by the Klein well is drawn from the Geary land.

On the Hefter lease to the north the defendant completed six wells, four of them being located along its eastern boundary which was on line with the eastern boundary of the Geary lease. All of the four wells were located within 150 feet from the eastern boundary, and some of them closer. The farthest south Hefter well, designated as Hefter No. 3, located approximately 150 feet west of the east line and 294 feet north of the north line of the Geary tract, was completed March 22, 1938. Some of the wells on this lease began producing in February, 1938, and up to and including August, 1939, all together had produced 103,296.19 barrels.

About the time and shortly after the completion of the Geary well there were completed on the town lots lying to the east the following wells: The Westman, located 161 feet northeast of the northeast corner of the Geary lease, which since March, 1938, has produced 8,326 barrels. The Oestreich well, 151 feet from the northeast corner of the Geary tract, which since April, 1938, has produced 7,005 barrels. The Pullen well, 88 feet from the east line of the Geary tract, which since September, 1938, has produced 3,805 barrels. All production is to and including the month of August, 1939. Under the evidence, it is a fair estimate that 3,000 barrels of the oil produced by the townsite wells up to and including August, 1939, has been drawn from the Geary lease.

It is stipulated between the parties that the cost of drilling, equipping and operating the Geary No. 1 well and the Klein No. 1 well, as set forth under subdivisions (a) and (b) of paragraph four of the fourth defense of the answer of the defendant, are correct, as set forth therein, and that said costs were the reasonable and usual costs of drilling and equipping said wells at the time the said wells were drilled and

equipped. Said subdivisions (a) and (b) are as follows:

"(a) the actual cost of drilling and equipping the Geary No. 1 well, exclusive of tanks, was the sum of $8562.43; that the actual direct cost of operating said well from March, 1938, to June 1, 1939, has been the sum of $1067.57, a monthly average of $53.03 per month, and not including the costs of general supervision, district general and shop expenses, and other costs;

"(b) that the actual cost of drilling and equipping the Klein No. 1 well, offsetting the proposed location in the southeast corner of the Geary East ten acres on the south, exclusive of tanks, was the sum of $8260.08; that the actual direct cost of operating said well from July, 1938, to June 1, 1939, has been the sum of $557.41, a monthly average of $44.67 per month, and not including the costs of general supervision, district general and shop expenses, and other costs;"

The greater weight of the evidence shows that if more than one well had been drilled by the defendant on the northeast part of the east ten acres of the Geary lease the production from said wells would not have paid out the initial cost of drilling, equipping and operating said wells and made a reasonable profit. A location somewhat farther to the east of the single well that was drilled on the Geary tract and a little north would have better protected the Geary lease against drainage from other wells on the north, east and northeast. A prudent operator should have known this from the facts that were available to the defendant at the time the Geary well was put down and was undoubtedly known and considered here. Whether such location would have produced materially more oil is open to question. Though the oil structure rises somewhat toward the east the area from which the well located farther east could recover oil would have been reduced by the other wells. In view of the number and close proximity of the townsite wells it seems obvious that the location of the Geary well within 150 or 200 feet of the eastern boundary would only partially and inadequately have protected the lease against the drainage by those wells. Since, under the evidence, another well to the west would not be warranted by the probable production from the Benoist sand which is the producing sand here, and the oil lying to the west will re-main unrecovered, if not reached by this well, it is probable that the well as now located will ultimately recover as much or more oil than if it had been placed farther east. In view of the light production of all the wells and the problem of securing as much production as possible from a single well in the northeast portion, it appears that the ultimate loss which will accrue to the plaintiffs by reason of the failure to locate the well farther east is not considerable, if any.

If Hefter well No. 3 and the Geary well had been located equi-distant from the common boundary line, all of the unfair drainage by the defendant from the north would have been prevented. As it is, the defendant is receiving some benefit by drainage on the north it is not entitled to receive. Then, too, by locating the Geary well within 294 feet, instead of 320 feet, of the northern boundary the probabilities that a well in the southeast part of the lease offsetting defendant's Klein well would pay for itself and make a profit would have been strengthened to that extent.

While Mr. Buchanan, defendant's vice president in charge of expansion, was of the opinion that to put a well in the southeast part of the Geary lease, in view of the present location of the well, would not have been a prudent operation, he thought it might eventually pay out but that it was very questionable as to whether it would be a profitable venture.

Looked at solely from the defendant's point of view, the location of a well in the southeastern part of the lease perhaps would not have been a prudent operation in view of defendant's belief that, though it might pay out, the chances of making a profit were very questionable. If the defendant had no interest in the adjoining leases on the north and south, it would seem that its defense, based on the foregoing facts, might be sound. But here the mind is haunted by the fact that the defendant is the beneficiary of the oil drained from plaintiffs' land by the wells on the north and south which belong to the defendant. It has not only been saved the cost of drilling, equipping and operating a protecting well but it gets the oil anyway without plaintiffs being paid for it.

The unfairness of this situation must have appealed to defendant at the time that, in answer to plaintiffs' demand, though denying any obligation to do so, it

offered to drill an offset well in the southeast part of the lease upon condition that there be no further demands for offset wells. Plaintiffs say they did not accept this offer because the condition it contained would operate against them unfairly in the future should other producing sands be discovered. At any rate, the minds of the parties did not meet and no agreement was concluded.

I cannot escape the conclusion that from the facts hereinbefore found and recited there arose an obligation on the part of the defendant either to drill such wells as might be necessary to protect plaintiffs against drainage by wells on defendant's leases or, in the alternative, to make provision for making good plaintiffs' losses by payment of money.

In the situation disclosed by the foregoing facts and discussion I have the opinion that the equities as between the parties are with the plaintiffs and that plaintiffs, though not seriously damaged by defendant's failure fully to comply with its obligations under the lease, are entitled to some relief.

My conclusions are as follows:

1. The lease does not contain express covenants relieving lessee of implied covenants to use reasonable diligence to protect plaintiffs' land from drainage by wells on adjoining leases. Such implied covenants adhere in this lease and defendant has failed to exercise reasonable diligence in this respect.

2. Under the facts of this case the lessee may not rightfully drain the oil from plaintiffs' land by wells on adjacent leases owned by lessee without offsetting such wells or making suitable provision for the protection of plaintiffs by a money payment.

3. Defendant's failure to protect the Geary land by proper offset wells against drainage by defendant's wells on the Hefter and Klein leases has wrongfully damaged plaintiffs in the sum of $500 in recoverable damages, shown by the evidence, such damages amounting to $250 up to and including August, 1939, and $250 subsequent thereto, including future damages, for drainage from the Benoist sand on the Geary land by said Klein well and Hefter well No. 3.

4. Defendant's failure to comply fully with the implied covenants of the lease does not entitle plaintiffs to a cancellation of the lease.

5. Plaintiffs are not entitled to any relief by reason of the drainage shown by the evidence caused by the townsite wells on the east.

6. Defendant shall pay the costs of suit.

Plaintiffs will prepare and submit to the court, upon notice to counsel for defendant, findings and conclusions pursuant to this memorandum, to be entered herein in compliance with the provisions of Rule 52 of the Federal Rules of Civil Procedure, 28 U. S.C.A. following section 723c, and decree accordingly.