75 F.3d 1225
 34 Fed.R.Serv.3d 63
 Florence I. FINLEY, Trustee, under U/D/T dated March 23,
1991, f/b/o John E. Finley, Sr., Trustee under U/D/T dated
March 23, 1991 f/b/o Florence I. Finley, John E. Finley,
Jr., and Julie Wright, Plaintiff-Appellant,
v.
MARATHON OIL COMPANY, Defendant-Appellee.
 No. 95-2376.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 8, 1995.
Decided Feb. 14, 1996.
 
 Appeal from the United States District Court for the Southern District of Illinois, Benton Division. No. 94 C 4086; Philip M. Frazier, United States Magistrate Judge.
 Jerry D. Miller (argued), Bowen & Miller, Olney, IL, Robert E. Shaw, T. David Purcell, Mitchell, Neubauer, Shaw & Hanson, Mt. Vernon, IL, and James D. Stout, Bridgeport, IL, for plaintiff-appellant.
 Jerome E. McDonald (argued) and Craig R. Hedin, Campbell, Black, Carnine & Hedin, Mt. Vernon, IL, for defendant-appellee.
 Before POSNER, Chief Judge, and LAY* and ROVNER, Circuit Judges.
 POSNER, Chief Judge.
 
 
 1
 The appeal in this diversity suit presents interesting questions, exotic in this circuit, of oil and gas law, as well as questions concerning the application of amendments made in 1993 to the rules governing pretrial discovery in federal district courts.
 
 
 2
 The Finleys own two adjacent parcels of land in southern Illinois. At different times they leased oil and gas rights in the two parcels to Marathon Oil Company. The leases provided that the Finleys would receive one-sixth of any oil produced and Marathon would keep the other five-sixths as compensation for the risk and expense of producing. Later the Finleys entered into a "communitization" agreement with Marathon, consolidating the two leases into one but not altering the terms of the leases in any respect relevant to this appeal.
 
 
 3
 Immediately to the north of the Finleys' two parcels is a parcel owned by the heirs of McCroskey, who have leased their oil and gas rights to a different oil company. The underground formation from which the oil in the Finleys' land is pumped extends under the McCroskey parcel. The oil is extracted from the formation by the method known as secondary recovery, which involves injecting water into the formation with the aim of forcing the oil into producing wells and thence up to the surface. Marathon drilled an injection well at location T-2 on the Finleys' property and over a period of many years poured hundreds of thousands of barrels of water down it in an effort to extract additional oil. The Finleys presented evidence, vigorously contested by Marathon, that the injection caused oil to migrate from the plaintiffs' part of the formation to the part under the McCroskey parcel and that this migration, or "drainage" as it is called in the trade, would have been prevented if only Marathon had drilled another producing well on the Finleys' property between the injection well and the boundary with the McCroskey parcel. The Finleys claim that in failing to prevent this drainage Marathon broke its contract with them and committed a breach of fiduciary duty as well. The trial judge dismissed the latter claim before trial; the jury brought in a verdict for Marathon on the breach of contract claim; and so the suit was dismissed and the Finleys appeal.
 
 
 4
 The lease required Marathon to prevent, so far as it was commercially practicable (that is, cost-justified) to do so (an important qualification), the drainage of oil from the lessor's property to that of adjacent landowners. The requirement was explicit in certain agreements made between Marathon and McCroskeys' heirs--agreements of which the Finleys, we may assume, were third-party beneficiaries. It is also an implicit corollary of the implied duty of an oil and gas lessee to operate the leasehold prudently rather than wastefully. Fransen v. Conoco, Inc., 64 F.3d 1481, 1487 (10th Cir.1995); Tidelands Royalty "B" Corp. v. Gulf Oil Corp., 804 F.2d 1344, 1348-49 (5th Cir.1986); Williams v. Humble Oil & Refining Co., 432 F.2d 165, 171-72 (5th Cir.1970); Amoco Production Co. v. Alexander, 622 S.W.2d 563, 568 (Tex.1981). Both the general duty of prudent operation and the subsumed duty to avoid drainage illustrate the office of the common law of property and contracts in interpolating into a contract or conveyance provisions that the parties would almost certainly have agreed to had the need for them been foreseen. Although oil and gas litigation is not frequent in Illinois, there is no doubt that the common law of Illinois recognizes the duty to avoid drainage. See Carter Oil Co. v. Dees, 340 Ill.App. 449, 92 N.E.2d 519, 523 (1950); Ramsey v. Carter Oil Co., 74 F.Supp. 481, 482 (E.D.Ill.1947) (applying Illinois law); Geary v. Adams Oil & Gas Co., 31 F.Supp. 830, 835 (E.D.Ill.1940) (ditto).
 
 
 5
 Whether Marathon complied with its duty to avoid drainage was a question of fact that, if we set to one side for a moment the Finleys' objection to two of the trial judge's evidentiary rulings, the jury was entitled to resolve as it did in favor of Marathon. Marathon presented expert evidence that there was no recoverable oil in the portion of the Finleys' property in which the injection well at T-2 was drilled and so there could not have been a diversion of oil to the McCroskey leasehold as a consequence of the pumping of water into that well.
 
 
 6
 Had Marathon been the lessee of the McCroskey oil and gas rights and had deliberately diverted oil from the Finleys' properties to the McCroskey property because it had a better deal with the heirs--had Marathon, in other words, been the common lessee of the two properties--it might have been guilty of conversion. Ramsey v. Carter Oil Co., supra, 74 F.Supp. at 483. Indeed, even without such a nefarious purpose, diversion by a common lessee might be deemed a per se violation of the duty to avoid drainage, making the lessee liable for the loss to the lessor without regard to the cost to the former of avoiding the drainage. E.g., Cook v. El Paso Natural Gas Co., 560 F.2d 978, 982-84 (10th Cir.1977); Geary v. Adams Oil & Gas Co., supra, 31 F.Supp. at 834-35. Or might not. The per se rule illustrated by Cook and less clearly by Geary has been severely, and as it seems to us justifiably, criticized, 5 Howard R. Williams & Charles J. Meyers, Oil and Gas Law §§ 824.1, 824.3 (1995), and has been rejected in many jurisdictions. See, e.g., Tidelands Royalty "B" Corp. v. Gulf Oil Corp., supra, 804 F.2d at 1353-54; Williams v. Humble Oil & Refining Co., supra, 432 F.2d at 172-73; Rogers v. Heston Oil Co., 735 P.2d 542, 547 (Okla.1984). Rogers states clearly what we take to be the correct view, that as in other cases of fiduciary duty the common lessee must treat the lessor as well as he would treat himself, but not better. Maybe, despite Geary, which is after all just the opinion of one district judge, and not a recent opinion at that, Illinois would adopt this view and reject Geary.
 
 
 7
 We need not pursue these byways. Marathon was not the lessee of the heirs' oil and gas rights, had therefore no incentive to divert the oil to them, had in fact an incentive not to do so, was found not to have done so, and at worst merely blundered (if drainage there was, as apparently there was not, and if the drainage could have been prevented at a cost less than the value of the oil drained away) rather than committed a deliberate wrong. We shall see in a moment that Marathon's incentive to avoid drainage may have been impaired. But the Finleys neither remark this nor presented at trial any evidence that Marathon was acting deliberately rather than mistakenly, or indeed that it had committed any wrong more serious than a garden-variety breach of contract; for an oil and gas contract does not make the lessee the fiduciary of the lessor in the absence of special circumstances not shown here. O'Donnell v. Snowden & McSweeney Co., 318 Ill. 374, 149 N.E. 253, 255 (1925); Kirke v. Texas Co., 186 F.2d 643, 648 (7th Cir.1951) (applying Illinois law); Norman v. Apache Corp., 19 F.3d 1017, 1024 (5th Cir.1994). So the Finleys could not have obtained punitive damages, Mijatovich v. Columbia Savings & Loan Ass'n, 168 Ill.App.3d 313, 119 Ill.Dec. 66, 69, 522 N.E.2d 728, 731 (1988); Naiditch v. Shaf Home Builders, Inc., 160 Ill.App.3d 245, 111 Ill.Dec. 486, 496, 512 N.E.2d 1027, 1037 (1987); Amoco Production Co. v. Alexander, supra, 622 S.W.2d at 571, which was the main reason they had for dressing their claim in fiduciary-duty breeches.
 
 
 8
 The basis for the claim that Marathon was the Finleys' fiduciary is that the "communitization" agreement was the equivalent of a unitization agreement, with Marathon corresponding to the unit operator. Many cases do hold that the unit operator, that is, the manager of the unitized field, is the fiduciary of the owners of the field, Fransen v. Conoco, Inc., supra, 64 F.3d at 1487; Leck v. Continental Oil Co., 971 F.2d 604, 607 (10th Cir.1992); Young v. West Edmond Hunton Lime Unit, 275 P.2d 304, 308-09 (Okla.1954); 6 Williams & Meyers, supra, § 990, p. 869, and while other cases think it enough that the participants should have a duty of good faith toward each other, e.g., Amoco Production Co. v. Heimann, 904 F.2d 1405, 1411-13 (10th Cir.1990); Rutherford v. Exxon Co., U.S.A., 855 F.2d 1141, 1145-46 (5th Cir.1988), Illinois is in the former camp. Carroll v. Caldwell, 12 Ill.2d 487, 147 N.E.2d 69, 74 (1957). Unitization refers to the exploitation of an oil or gas field that lies under the surface of a number of landowners as if it were under joint ownership, in order to optimize the rate, and minimize the cost, of production. It eliminates the temptation to socially wasteful conduct that would otherwise exist, when an oil field is owned in common, because each operator has an incentive to remove as much oil as fast as he can, even though the cost of production for the field as a whole might be less and the total amount recovered greater if the field were exploited by a single owner. Unitization is especially needful when secondary recovery is the method of getting the oil out of the ground, because the injection of water is likely to flood out parts of the formation, so that some of the lessors will no longer have any recoverable oil beneath their land, yet their sacrifice will have benefited the lessors as a whole. 6 Williams & Meyers, supra, § 901, p. 4.
 
 
 9
 Unitization makes the owners of the rights in the unitized field joint venturers, and joint venturers owe fiduciary duties to one another. Carroll v. Caldwell, supra, 147 N.E.2d at 74; Newton v. Aitken, 260 Ill.App.3d 717, 198 Ill.Dec. 751, 756, 633 N.E.2d 213, 218 (1994); Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546 (1928) (Cardozo, C.J.). It is only a slight further step, and one taken by a number of jurisdictions as we have noted, to regard the manager of the joint venture, or in the case of oil-field unitization the unit operator, as the fiduciary of the joint venturers. But this is not a case of unitization. The two leases were owned by the same people and operated by the same producer, Marathon. The communitization agreement merely formalized the ownership and operating arrangements. It was no more a joint venture than when one supplier sells to one dealer.
 
 
 10
 What is true is that a conflict of interest is built into any royalty arrangement, or any other arrangement in which one party to a contract receives a percentage of gross revenues. The Finleys were entitled to one-sixth of all oil produced under the lease, and this was the equivalent of a 16.67 percent royalty on the gross revenues (minus selling costs) from the sale of all the oil. It was a matter of indifference to them, but intense interest to Marathon, how much the oil cost to produce. Suppose the oil had a value of 100, and cost 90 to produce. Production would then be profitable from the standpoint of the property as a whole and of course from the Finleys' standpoint. But Marathon would lose money because it would bear the entire cost and that cost (90) would exceed its share of the revenues (83.33). A similar conflict is created by royalty arrangements between publishers and authors and by contingent-fee contracts. It is not, however, a conflict that has prompted the courts to impose a fiduciary duty on the cost-bearing party to such contracts, Marathon in this case. Lawyers are deemed fiduciaries of their clients but this is so whether or not the lawyer is being paid on an hourly or a contingent basis. We noted earlier that Illinois has expressly declined to make the oil and gas lessee a fiduciary of the lessor.
 
 
 11
 This analysis shows, however, that the Finleys' breach of contract claim is not so groundless as it might at first appear to be. One might think it irrational for Marathon to divert oil from property under lease to it to property leased to a competitor. But if there was recoverable oil in the vicinity of T-2 yet not enough to cover the cost of extracting it after dividing it with the Finleys in accordance with the terms of the lease, Marathon would have a disincentive to drill another producing well even if the consequence of not doing so was to divert some recoverable oil to another producer. The Finleys do not argue the point, however; nor is there evidence that Marathon yielded to this temptation to short-change them.
 
 
 12
 The district judge was right, therefore, to throw out the claim of breach of fiduciary obligation, and the only other question raised by the appeal is whether he abused his discretion in refusing to permit the introduction of two pieces of rebuttal evidence at the trial of the contract claim. One was a set of charts prepared by the Finleys' expert showing a striking correlation between the injection of water into the well at T-2 and the production of oil from the wells on the land owned by McCroskey's heirs. The other was a jar containing oil taken from the injection well itself shortly before trial and purporting to demonstrate that there was recoverable oil in the part of the formation that was proximate to the well, contrary to the testimony of Marathon's experts.
 
 
 13
 The federal civil rules, as recently revamped, require disclosure to one's opponent of expert testimony intended for use as rebuttal evidence within 30 days of the opponent's disclosure of his expert testimony, unless the district court otherwise directs or the parties otherwise stipulate. Fed.R.Civ.P. 26(a)(2)(C). The Finleys missed the deadline by months, courting exclusion. New Rule 37(c)(1) provides that "a party that without substantial justification fails to disclose information required by Rule 26(a) ... shall not, unless such failure is harmless, be permitted to use as evidence at a trial ... any ... information not so disclosed" (emphasis added). The sanction of exclusion is thus automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or harmless. The Finleys have tried to show both. They have succeeded in showing neither. They say they could not have prepared their charts earlier because Marathon withheld vital data, but the trial judge was entitled to reject this explanation as unfounded. The data in question were in the possession of a third party, the oil company that had leased oil and gas rights from McCroskey's heirs, and the Finleys were tardy in seeking the data from that third party. The failure of timely disclosure of the proposed rebuttal evidence to Marathon was not harmless. While it is true that the data used to create the charts were not new, the manner of massaging them to demonstrate the correlation between the injection of water in the well at T-2 and the output of oil from the property owned by the McCroskey heirs was new, and because disclosed only a few days before the start of the trial would have placed on Marathon a heavy burden of meeting the new evidence at trial with its own experts' analysis. So at least the trial judge was entitled to conclude in the exercise of the broad discretion that the law vests in the presiding officer at a trial in such matters.
 
 
 14
 The jar was to be the piece de resistance of the Finleys' case. The ground had been carefully laid in the cross-examination of Marathon's three experts. The Finleys' lawyer had asked each of them what would happen if you drew liquid out of the injection well at T-2. One said that you would get clear water, another that you would get dirty water, and the third that, because the water that had been pumped into the injection well had come from elsewhere in the oil field and therefore contained traces of oil, and oil is lighter than water, you would at first get oil and later, after all the small amount of oil had been drawn off, water. Although Marathon had stopped injecting water months earlier because it had concluded that there was no recoverable oil in the vicinity of the well, the previously injected water had not yet all drained off and one of the Finleys had, shortly before trial, gone to the injection well, opened a tap, and filled a small jar (the kind used for preserves). The top third or so of the jar, which was exhibited to us at the oral argument, consists of a dense black substance, plausibly oil, and the bottom two-thirds or so of what appears to be murky water. The Finleys wanted to show the jar to the jury and argue that it impeached Marathon's experts. The trial judge refused to permit this on the ground that in and of itself the jar proved nothing.
 
 
 15
 We think that he was entitled to reach this conclusion and we add that judges should be cautious in allowing the introduction of physical exhibits, especially as rebuttal evidence, without firm foundations. Physical exhibits ("demonstrative evidence") are a very powerful form of evidence, in some cases too powerful, as we learn in Julius Caesar from Antony's masterful demagogic use of Caesar's blood-stained toga and slashed body to arouse the Roman mob. After hearing a welter of confusing and contradictory testimony, perhaps of a technical nature, as here, or being led through a maze of inscrutable documentation, also as here, the jury is invited to resolve its doubts on the basis of a simple, tangible, visible, everyday object of reassuring familiarity. 2 McCormick on Evidence § 212, pp. 3-4 (4th ed., John William Strong gen'l ed., 1992); Michael H. Graham, Handbook of Federal Evidence § 401.2 (3d ed. 1991). "Seeing is believing," as the misleading old saw goes. The trial judge must make sure that the jury is not misled concerning the actual meaning of the object in the context of the litigation. The tiny jar with its film of oil meant nothing in itself. Because oil will float to the top of a column of water, and because the injection well, which was more than 1,000 feet deep, contained a very long column of water, even a tiny residue of oil would, coalescing at the top of the column, produce a few ounces of oil, all the jar contained. This would be no evidence at all that the formation under the well contained enough recoverable oil to have justified Marathon's drilling another producing well. It would not contradict the third expert but indeed would corroborate his testimony; probably not the second either; and the first was merely guessing that the residue was too small even to dirty the water--a mistake, but an irrelevant one.
 
 
 16
 It is true that had the jar been allowed into evidence Marathon would have had an opportunity to rebut along the lines just suggested. That procedure would have been a proper one for the district judge to adopt but it was also proper for him to insist, as a precondition to admitting the jar, that the Finleys lay a proper foundation. They should have asked their expert to "sponsor" the jar, explaining how it showed that Marathon's experts should not be believed. Of course, it is quite possible that no reputable expert would have so testified.
 
 
 17
 We find no reversible error. The judgment for the defendant is therefore
 
 
 18
 AFFIRMED.
 
 
 
 *
 Hon. Donald P. Lay of the Eighth Circuit, sitting by designation