ROY A. WITTY *et al.*, Plaintiffs-Appellants, *v.* C. CASEY HOMES, INC., *et al.*, Defendants-Appellees.

First District (2nd Division)    No. 80-2012

Opinion filed December 15, 1981.

Zipperman, Levin & Associates, Ltd., of Chicago (Edward S. Lipsky and Adrienne Zipperman Shaps, of counsel), for appellants.

Morgan, Tuchow & Karzov, of Chicago (Martin Tuchow, Arnold J. Karzov, and Philip S. Witt, of counsel), for appellee C. Casey Homes, Inc.

JUSTICE PERLIN delivered the opinion of the court:

This is a breach of contract action brought by plaintiffs, Roy A. and Anne Witty, against defendants, C. Casey Homes, Inc., a home-building contractor, and Davia and Benda, Inc., a masonry subcontractor. In their complaint plaintiffs alleged that contrary to the specifications in the building contract, which called for "face brick veneer," defendants substituted defective ordinary brick. In a bench trial defendant Davia and Benda was dismissed because it was not a party to the contract with plaintiffs. Plaintiffs have not appealed that order.

The trial court found that defendant Casey, the builder-vendor, had breached the contract but held that plaintiffs were not entitled to recover the estimated cost of correcting the defect ($50,000) because the method of correction, requiring the replacement of every brick in the home, was impractical. The court suggested that the proper measure of damages in this case was the diminution in value of the residence caused by installation of the defective brick. Since plaintiffs presented no evidence of loss of value, the court entered judgment for defendant Casey. From that judgment plaintiffs appeal contending (1) that the trial court erred in refusing to apply the cost of repair measure of damages for breach of a building contract; and (2) that the trial court should have awarded plaintiffs the cost of repair for breach of the implied warranty of habitability adopted in *Petersen v. Hubschman Construction Co.* (1979), 76 Ill. 2d 31, 389 N.E.2d 1154. For the reasons which follow, we affirm the judgment of the trial court.

On October 5, 1972, plaintiffs entered into a building contract with defendant Casey for the construction of a single family residence in Oak Lawn, Illinois. The contract price was $54,566. Casey agreed to provide "all the materials necessary, and to make, erect, build and complete in a good, substantial and workmanlike manner," a home according to the specifications set forth in "Anderson Associates Plan #5631," which was attached to the contract. Paragraph three of the specifications states:

> "*Exterior walls*: Face brick veneer as shown on plan. Face brick not to exceed $80.00 per thousand. Point all loose brick and joints."

Witty paid Casey the agreed upon contract price. Sometime after the residence was completed and Witty had taken possession, he noticed a problem with the brickwork: "It's flaking and popping, white particles from the interior of the brick [were] working their way to the exterior, popping off the surface of the brick." Casey failed to remedy the problem after Witty brought it to his attention. Witty subsequently brought suit against Casey, the builder-vendor, and Davia and Benda, the masonry subcontractor, alleging that defendants, without Witty's consent, had substituted defective ordinary brick in place of the face brick veneer required by the contract, and that the brick installed was deteriorating and disintegrating.

Witty testified that he did not select the brick to be used in the construction of the home. He had, however, picked out a particular color by pointing out that color on another residence built by defendant Casey on the same street on which the Witty home is situated. He also described the "flaking and popping" problem he had observed. Witty admitted that he saw the brick on the premises before it was installed but did not inspect it.

Paul E. Flood, an engineer employed by Walter H. Flood & Co., testified on behalf of the plaintiffs. After being qualified as an expert, Flood described what he had discovered in examining the brick at the Witty home:

"We found that the bricks were what would be termed common brick; they had a dark applied flashing to them; they contained lime balls that cause pop-outs in the brick that created some unsightly defects in the face of the brick, in the exterior walls of the brick; that we revealed these white particles, the lime balls, behind each pop-out that occurred."

In court Flood identified a brick removed from the fireplace wall as "Chicago common brick" which has an applied dark facing. The sample had defects that cause pop-outs. An analysis of the sample brick revealed that the material behind the pop-outs consisted essentially of lime,

"* * * which are called in the industry 'lime balls,' that get in with clay sometimes, and, in the firing process of the brick, they are dehydrated, the calcium oxide. And when the brick is fired, they're interior in the brick.

And then as it ages, as it oxidizes through atmosphere and through moisture, these lime balls will convert back to lime or calcium carbonate and ultimately, with expansion, causes the defects in this brick and more serious in some others."

Some of the bricks in the home were "very badly warped out" more than one-quarter of an inch.

Witty's contract specified "face brick veneer." Flood testified that "face brick" is "brick made to a more stringent specification than common brick. It's * * * usually made from more select clays, it has a tighter quality control as far as warpage and distortion is concerned. It usually has a tighter quality control as far as color is concerned." "Brick veneer" indicates "a frame residence with brick applied to the outside as a facade to the wall. It's not a structural bearing member that it would be if it were solid masonry construction." Flood found no face brick in the structure. The defective brick did not affect the stability of the home.

Flood estimated that "it would cost $50,000 or more to replace the face brick in the residence." This estimate was based on the number of man-hours of labor required ($14 per hour plus fringe benefits for each of two bricklayers plus the wages for a laborer), the cost of the bricks (approximately 8,000 face bricks which, at the time of trial, were priced between $120 and $160 per thousand), and the cost of the wood trim that would have to be replaced. In order to effect the repairs, every brick in the house would have to be replaced, the work "would have to be done in stages to shore up part of the building * * * to minimize any damages to the interior or exterior of the house" and all of the wood trim on the doors, windows and fascia would have to be removed before the defective bricks could be taken out. The work could result in "much damage to doors, door frames, window frames," and "a sliding glass door * * *."

Plaintiffs rested without offering any evidence that the installation of the allegedly defective brick caused a diminution in the value of the premises.

In defense, Casmer Solewski, president of C. Casey Homes, Inc., the builder-contractor, testified that Witty had selected the particular type of brick which was to be used in the construction of his home from another fully constructed residence which Witty viewed in the same subdivision Casey had developed. Common brick can be used as a veneer, provided that the inner frame portion of the residence is constructed before the brick is placed on the outer wall. Solewski testified that there is a difference in price between face brick and common brick but that the brick used in the Witty home is also used for facing.

Solewski testified further that the popping of lime deposits does not weaken the brick or affect the structural stability of the residence. He was not aware of any latent defect in the brick Witty selected.

■■ At the conclusion of the evidence, defendant Davia and Benda was dismissed from the action because it was not a party to the contract between the Wittys and Casey. Casey thereafter moved for judgment in its favor because of plaintiffs' alleged failure to prove a proper measure of damages. The trial court found that Casey had breached the contract by

not supplying the brick specified in the contract. The court, however, entered judgment in defendant's favor because plaintiffs' proposed measure of damages, cost of repair, was impractical and plaintiffs had introduced no evidence that the defective brick had diminished the value of the home.

I

The first issue in this case is the proper measure of damages for breach of a building contract.

"As a general rule, the measure of damages or the credit due the purchaser, when performance by the builder has been less than full performance, is the cost of correcting the defects or completing the omission, rather than the difference in value between what ought to have been done in full performance and what was actually done. But this general rule only applies where the correction or completion would not involve unreasonable destruction of the work done by the contractor and the cost thereof would not be grossly disproportionate to the results obtained. If to repair the defects or omissions would require a substantial tearing down and rebuilding of the structure, the measure of damages is the difference in value between the work if it had been performed according to the contract and that which was actually performed." Brewer v. Custom Builders Corp. (1976), 42 Ill. App. 3d 668, 674, 356 N.E.2d 565.

Plaintiffs' own expert testified that the cost of replacing the common brick with the face brick called for in the specifications would be at least $50,000, which approximates the original contract price for the entire residence, $54,566. The work would require taking out every brick in the home, shoring up part of the structure to minimize damage to both the exterior and the interior, and removing all of the exterior wood trim. The project could result in extensive damage to doors, door frames, window frames and a sliding glass door. Based on this testimony, we believe that the proper measure of damages was, as the trial court indicated, diminution in value attributable to the defect and not the cost of repair. Plaintiffs, however, failed to introduce any evidence of diminished value. On December 11, 1979, 2½ months after trial, the trial court refused plaintiffs' request to reopen the case "to prove damages." The colloquy between plaintiffs' counsel and the court, however, indicates that plaintiffs sought to reopen the case for the purpose of presenting additional evidence regarding the cost of repair and not for the purpose of proving diminished value. Since we have determined that in this instance the cost of repair was not the appropriate measure of damages, we find no prejudice to

plaintiffs in the trial court's denial of leave to reopen. Accordingly, the trial court properly entered judgment for defendant Casey on plaintiffs' complaint for breach of contract. We note that none of the cases plaintiffs cite applied the cost of completion or correction measure of damages to facts similar to those present here.

## II

The second issue presented is whether plaintiffs are entitled to recover the cost of repair for breach of the implied warranty of habitability adopted by the supreme court in *Petersen v. Hubschman Construction Co.* (1979), 76 Ill. 2d 31, 389 N.E.2d 1154.

*Petersen* was decided on May 18, 1979. Plaintiffs' suit was tried on September 27, 1979, and judgment was entered on December 11, 1979. Plaintiffs' post-trial motion was not denied until June 16, 1980. Plaintiffs tried their case solely on a theory of breach of an express provision of a written contract. Although their failure to seek recovery for breach of the implied warranty of habitability announced in *Petersen* would normally bar consideration of that theory on appeal (*Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 147, 324 N.E.2d 417), defendant has not argued waiver. We therefore address the merits of plaintiffs' argument.

In *Petersen* the supreme court held that "in the sale of a new house by a builder-vendor, there is an implied warranty of habitability which will support an action against the builder-vendor by the vendee for latent defects, * * *." (*Petersen v. Hubschman Construction Co.* (1979), 76 Ill. 2d 31, 39-40.) The defects must be "substantial." (76 Ill. 2d 31, 43, 44.) The test of "habitability" is not whether the house is capable of being inhabited but whether the house is reasonably suited for its intended use as a residence. 76 Ill. 2d 31, 40-42.

The defect in the present case is essentially an aesthetic one unrelated to the structural integrity of the residence. Neither *Petersen* nor any opinion construing it has determined whether latent defects that ultimately render a house aesthetically unsatisfying constitute a breach of the implied warranty of habitability. Even assuming, *arguendo*, that the latent defects in the brick installed in plaintiffs' home did breach that warranty, we cannot conclude, on the basis of the facts in this case, that the cost of repair was the proper measure of damages.

*Petersen* did not state which measure of damages—cost of repair or diminution in value—applies to breaches of the implied warranty of habitability. This was because the plaintiffs repudiated the contract and sought restitution. Nevertheless, cases decided both before and after *Petersen* have held that the measure of damages for breach of the implied warranty of habitability is the cost of repair. (*Colsant v. Goldschmidt*

(1981), 97 Ill. App. 3d 53, 57-58, 421 N.E.2d 1073; *Park v. Sohn* (1980), 90 Ill. App. 3d 794, 799, 414 N.E.2d 1, *appeal allowed,* October 19, 1981, Docket 54568); *Hanavan v. Dye* (1972), 4 Ill. App. 3d 576, 580, 281 N.E.2d 398; *Weck v. A:M Sunrise Construction Co.* (1962), 36 Ill. App. 2d 383, 396, 184 N.E.2d 728.) Unlike the instant case, however, the repairs in these cases did not entail unreasonable destruction of the premises, nor was the cost of repairs grossly disproportionate to the results obtained.[1]

No Illinois case has yet decided whether the diminution in value standard of damages should apply to breaches of the implied warranty of habitability where the cost of correction or completion standard would result in economic waste. We note, however, that other jurisdictions that have recognized the existence of an implied warranty of habitability and have adopted the cost of repair as the usual measure of damages have held that the cost of repair is not to be used where "the defects cannot be remedied without reconstruction of a substantial portion of the work." *Dobler v. Malloy* (N.D. 1973), 214 N.W.2d 510, 516, 518; accord, *Rogowicz v. Taylor and Gray, Inc.* (Tex. Civ. App. 1973), 498 S.W.2d 352, 354; *Moore v. Werner* (Tex. Civ. App. 1967), 418 S.W.2d 918, 920; *Bolkum v. Staab* (1975), 133 Vt. 467, 346 A.2d 210, 212.

■■ We believe the rule set forth in these cases is sound and assures symmetry in the law. Whether plaintiffs sue for breach of a building contract or for breach of the implied warranty of habitability, the measure of damages should be the same. The normal measure will be the reasonable cost of correcting the defects or completing the omission. Where, however, application of that measure of damages would require an unreasonable destruction of the work done by the contractor or would incur costs disproportionate to the results obtained, the appropriate measure of damages is the diminution in value attributable to the defects in construction. For the reasons previously set forth, we find that the proper measure of damages in the instant case for breach of the implied warranty of habitability (assuming there was a breach) was the loss of

---

[1] In *Colsant* the court affirmed a $684 judgment which compensated plaintiff for his costs in drying out a carpet and replacing a carpet pad damaged by water seepage from a blocked drain tile; in *Park* the court found that damages of $2707 were inadequate to compensate plaintiffs and remanded the cause for a hearing on damages. Plaintiffs' damages included water seepage, a faulty septic system, side lot building restriction violation and a nonfunctioning sump pump and drain tile system; in *Hanavan* the court affirmed a $588 judgment for water damage where the purchase price of the home was $31,500; and in *Weck* the court affirmed a $1793 judgment which included the costs of applying a waterproofing compound, repairing a leaking roof, correcting a leak in a bathroom, replastering a cracked and caved in ceiling, replacing warped kitchen cabinets, resetting and rehanging a door, installing street curbing and a driveway and filling a hole six feet deep that was the width of the lot and extended the length of the back yard.

value caused by the defective brick. Since plaintiffs offered no evidence of diminished value, the trial court properly entered judgment for defendant Casey. Accordingly, the trial court's judgment is affirmed.

Affirmed.

HARTMAN, P. J., and DOWNING, J., concur.