ERNEST W. NAIDITCH, Plaintiff-Appellee and Cross-Appellant, v. SHAF HOME BUILDERS, INC., *et al.*, Defendants-Appellants and Cross-Appellees.

Second District No. 2—86—0884

Opinion filed August 18, 1987.

246

Roger C. Goble, of Goble & Axelrod, of Highland Park, and Magee, Collins & Lodge, of Chicago (Kenneth M. Lodge, of counsel), for appellant Shaf Home Builders, Inc.

Norman S. Lynn and Joel D. Teibloom, both of Lynn & Levenstein, Ltd., of Chicago (Jeffrey D. Hupert, of counsel), for appellee.

JUSTICE REINHARD delivered the opinion of the court:

Defendants, Shaf Home Builders, Inc., Ted Shaf, and the First National Bank of Skokie, as trustee for trust No. 50027 (trustee bank), appeal from the judgment following a bench trial of the circuit court of Lake County which found in favor of plaintiff, Ernest W. Naiditch, on five of the six counts of his third amended complaint, awarding $51,547.08 in actual damages and $109,544.70 in punitive damages. Plaintiff cross-appeals the dismissal of count VI of his third amended complaint.

Defendants raise the following issues on appeal: (1) whether the complaint sufficiently stated a cause of action for fraud; (2) whether the trial court's finding of fraud was supported by clear and convincing evidence; (3) whether the trial court improperly based its finding of fraud upon misrepresentations regarding the structural integrity of the house; (4) whether plaintiff can recover for alleged wilful and wanton misconduct where the proved damages were solely for economic loss and there was no proof of an independent tort; (5) whether the failure to give notice of alleged problems with the air-conditioning system and the insulation barred plaintiff's recovery for these alleged defects under either the express or implied warranties; (6) whether plaintiff's claim for damages involving defects in the cathedral ceiling and the garage ceiling are barred by the statute of limitations; (7) whether the expense of plaintiff's expert witness is a proper element of actual damages; (8) whether the trial court improperly measured the damages based on the cost of effecting repairs of the problems; (9) whether the award of punitive damages was excessive; and (10) whether the trial court improperly determined that the express warranty contained in the contract expired in December 1986, rather than on October 15, 1981. Plaintiff's cross-appeal raises the following issue: whether the trial court erred by dismissing count VI of his third amended complaint alleging conversion.

Defendant Shaf has been in the business of constructing single family homes in the Chicago area for more than 30 years and operated Shaf Home Builders (hereinafter referred to with Shaf collectively as defendant). He developed a subdivision of luxury custom homes called High Ridge in Highland Park in the mid-1970's, and the house which is involved in this dispute was constructed in High Ridge in 1977. This 4 bedroom, 4½ bath home was originally designed to serve as a model home and office for the High Ridge development, and for three years, the house served as headquarters for approximately 10 employees of Shaf Home Builders. There were no complaints from the employees regarding the house, and there was no

testimony at trial which indicated that either defendant or any employee knew of any alleged defects in the house prior to the sale to plaintiff. The only apparent problem was an occasional water leak in the garage.

In April 1976, defendant filed the plans for the proposed house with the building department of Highland Park and obtained a building permit. In order to obtain a building permit in Highland Park, a builder was required to submit plans already approved and "affixed" with a seal by an architect for approval by the city. When the required plans for this house were submitted to the city, the city plan examiner made handwritten notations on the face of the plans, reflecting changes as a condition for issuance of a building permit. The changes required by the city included the addition of a ridge beam consisting of three 2- by 14-inch boards around a ³/s-inch plate within the peak of the cathedral ceiling in the living room and dining room area and the installation of a steel beam across the top of the sliding glass doors leading to the balcony above the garage. Once such changes were made on the plans, it was the dual responsibility of the builder and the city inspector to insure that the changes were complied with.

In the spring of 1977, construction began on the house. Some items, however, were omitted by defendant in the construction of the house. Instead of three 2- by 14-inch boards around a ³/s-inch plate within the peak of the cathedral ceiling, defendant used only a single 2- by 10-inch board. It was later determined that this omission, in the opinion of one structural engineer, made the support for the cathedral ceiling structurally inadequate. Defendant's structural engineer even stated that the single 2- by 10-inch ridge board was 750% overstressed prior to the initial repairs. The house, however, was subjected to the city's normal inspectional processes throughout construction, and a conditional certificate of occupancy was issued by the city in December 1980. The house had been placed on the market for sale in 1979.

On August 29, 1980, plaintiff executed a contract to purchase the house for $297,200. Title to this property at the time was held in a land trust at the trustee bank, and defendant, under the name of Shaf Home Builders, owned the beneficial interest and power of direction in the trust. At the time the contract was executed, it was anticipated that a closing would be held to transfer title on or about October 15, 1980. The contract called for a standard closing through which defendant would be paid the agreed-upon price and title would simultaneously be conveyed to plaintiff. The purchase was contingent on an

inspection of the house by a qualified contractor representing plaintiff. Such an inspection was actually made, and no objections were expressed as a result of the inspection. The contract also contained the following warranty provision:

"CONSTRUCTION WARRANTY

The Seller warrants that for a period of one year after the consummation of the attached agreement by delivery of deed, Seller will correct any defect due to faulty construction and or defective materials, except as otherwise excluded herein. Seller does not assume responsibility for any secondary or consequential damage caused by the defects."

The balance of the mortgage on the property as of October 15, 1980, was approximately $96,024.84. The mortgage arrangement between defendant and the mortgagee, Skokie Federal Savings and Loan (Skokie Federal), required defendant to pay $822 per month to the Skokie Federal as principal and interest. This represented an interest rate of $8\frac{3}{4}\%$ per annum. Prior to the scheduled closing on October 15, 1980, plaintiff and defendant agreed to a modification of their contract whereby plaintiff would pay defendant approximately $200,000 in cash on October 15, 1980, take possession of the house subject to the outstanding mortgage, and then pay defendant $822 per month. Defendant was to continue to pay the $822 per month to Skokie Federal and was required to deposit in escrow with the trustee bank the deed and a letter of direction to the trustee to convey the deed to plaintiff upon evidence of full payment of the mortgage. In addition, plaintiff was to pay defendant the remaining $95,279.55 on the mortgage on or before April 15, 1981, or he would be faced with an increase in the interest rate to 18% per annum.

Although the original contract terms called for delivery of a deed at closing, nothing was done to change the one-year limitation period from the date of the delivery of the deed in the express warranty included in the contract after the parties agreed that plaintiff would not have to make final payment until April 15, 1981.

Thereafter, plaintiff paid $200,000 in cash to defendant, and according to both defendant and Roger Rubin, plaintiff's attorney, the letter of direction was deposited by defendant with the trustee bank. The trustee bank, however, had no record in its file of receiving anything from defendant in 1980 relating to a deed or to a direction to convey to plaintiff.

Plaintiff took possession of the property after the closing and began extensive remodeling, paid the property taxes, utilities, and otherwise exercised all other rights of ownership. Defendant stated that

he did not ask for any release from plaintiff at this initial closing date in 1980, and there was no testimony that defendant had ever sought any release prior to 1983. Defendant also did not know of any alleged construction defects.

Attached to the original contract was a list of additional items to be completed by defendant. The testimony below indicated that defendant was contacted about his failure to complete the listed items, that some listed items were never completed, that some items were completed by defendant, and that several other items were completed by tradesmen employed by plaintiff. Defendant concedes in his brief that the costs for the completion of the items on the list were properly awarded to plaintiff by the trial court and does not contest this on appeal.

As April 1981 approached, plaintiff contacted defendant and requested an additional extension of the remaining amount due on the outstanding mortgage at the interest rate of 8¾%. Although plaintiff could have paid the debt at any time, he preferred to continue the loan because of its very advantageous rate. Defendant agreed that plaintiff could defer making the payment until such time as Skokie Federal, whose mortgage contained a "due-on-sale" clause, learned that the property had been transferred.

In the summer of 1981, Richard Hoffmeyer, a carpenter hired by plaintiff to remodel the house, noticed significant deflections or sagging in the cathedral ceiling. He told plaintiff that this was a "dangerous condition" and that the ceiling needed to be supported. Hoffmeyer also told plaintiff that the garage ceiling, which supported part of the second floor, was also sagging. Hoffmeyer called defendant's office on numerous occasions to attempt to apprise him of these problems. He stated that defendant finally came to the house to speak with him, and he showed defendant the apparent problem with the structure over the garage. Hoffmeyer stated that defendant became angry and left abruptly, denying the existence of any problem over the garage and before Hoffmeyer could finish explaining the problem with the cathedral ceiling.

Hoffmeyer recommended to plaintiff that certain steps be taken in order to arrest the sagging he deemed unacceptable in both the cathedral ceiling and the garage ceiling, and plaintiff agreed to the work recommended by Hoffmeyer. Thereafter, Hoffmeyer performed the work recommended. He testified that the work merely stopped the sagging and did not repair the ceilings. In 1981, Hoffmeyer did not know of the basic structural causes of these problems, or, indeed, whether there were any underlying structural problems at all.

Plaintiff also claimed that in the summer of 1981, his wife observed certain problems with the operation of the central air-conditioning in the house in that it was warmer upstairs than downstairs. She called a local company specializing in residential air-conditioning replacement and repair, which attempted to solve the problem by adding Freon to the existing air-conditioning system. In 1982, however, she felt it was still too warm, and she had an engineer inspect the system, who determined that the problem was due to inadequate and improper duct work. To correct this, the engineer recommended the installation of an additional air conditioner in the attic, which was added along with an air cleaner. She never asked defendant to review the adequacy of the air-conditioning system, never told him that there was a problem with the air conditioning, never obtained any other estimates or opinions about the air-conditioning system, and never stated that the house was uninhabitable with the original system. None of defendant's employees had complained about the air-conditioning while the house was used as a model and office.

Additionally, during the winter of 1981-82, plaintiff's wife became concerned about drafts and cold in the bedrooms above the garage on the second floor. She contacted a company which did insulation work, and insulation was added to the garage area, eliminating the problem. Neither plaintiff nor his wife contacted defendant prior to adding the insulation and informed him of their complaints.

Plaintiff believed that there was still a problem with the area above the garage ceiling in the spring of 1982 because of the continuing leak and was concerned about the possible structural soundness of the house. He was also concerned with the responsibility and integrity of defendant as he had been making payments of $822 per month to defendant for well over a year, and paid substantial sums to redecorate, as well as paying property taxes, insurance and utility bills, yet never received the deed to the house.

In July 1982, plaintiff brought in a structural engineer, Stuart Jacobson, to review the property and make a detailed inspection of the house. Jacobson obtained and reviewed the 1976 plans from the city's files. Based on his review and subsequent investigation and analysis, Jacobson reported that there were serious problems with both the structure of the cathedral ceiling and the area above the garage. In addition to these problems, he determined, in 1985 when the roof was opened and inspected just prior to trial, that additional support was also required in the roof over the attic. Jacobson testified that the house had not been built in accordance with the plans which had been approved by the city in 1976. In the garage and cathedral

ceilings, there should have been steel plates in certain supports. In the attic, a certain type of truss was originally designed, but it had been replaced with bracing which Jacobson felt was inadequate.

Defendant testified that he had changed the plans after the original plans had been approved by the city, and that the "as built" plans had been brought to the city for approval, although no stamped set of plans could be produced. Defendant also stated that the changes were intended to improve the house.

In November 1982, defendant retained the services of Sheffee Lulkin, a consulting structural engineer, to inspect the house. Based on information received from defendant and defendant's employees, as well as his own inspection of the property, Lulkin concluded that the building was safe. He did not, however, open, measure, or in any way seek to determine what, if anything, was actually in the cathedral ceiling as support; nor did he contact Nunzio Spagnoli, the original contractor/carpenter who built the house, concerning construction of the house until shortly before trial. Lulkin's findings, based on defendant's representations to him together with the 1976 plans, were transmitted to the city. Also, there was testimony that in 1982, defendant or Spagnoli told Lulkin that there was a beam in the cathedral ceiling, when in fact there was only a board.

The results of Jacobson's investigation were also submitted to the city, which led to a series of three-way communications between representatives of plaintiff, defendant, and the city. Defendant finally delivered a set of plans labeled as "as built" to the city, and on November 30, 1982, the city issued a certificate of occupancy. The testimony at trial, however, indicated that had the city known in 1982 that the cathedral ceiling did not contain a ridge beam but a ridge board, it would have acted differently.

On or about October 5, 1982, defendant arranged for the title of the house to be transferred to Grace Schuster, an employee of defendant, which was executed in a trustee's deed by the bank and delivered to Schuster. Defendant explained that this transfer was made at that time because plaintiff had allegedly stopped making the monthly payments. Plaintiff, however, presented cancelled checks, "return receipts" from the post office, and testimony which indicated that the monthly payments were made to defendant at least through August 1983. Later, defense counsel stated on the record and stipulated that defendant was incorrect about when payments were stopped.

In early 1983, plaintiff pressed defendant for some satisfaction concerning the problems in the house. A closing was tentatively set for the end of July 1983. Closing documents were prepared by defend-

ant, and he included a general release. Plaintiff's counsel informed defendant that he was not entitled to a general release upon closing, and that plaintiff was willing to close and to pay off the remainder of the amount due Skokie Federal on the mortgage in return for the title to the house. Defendant, however, refused to close without obtaining a general release. Defendant later admitted that he neither knew whether he had a legal right under the contract to ask for such a release nor knew that he had no such right.

On November 16, 1983, plaintiff filed the first of four verified complaints requesting delivery of the title to the house and alleging breach of contract and breach of an implied warranty of habitability. These claims were later supplemented when, during the pendency of the trial, plaintiff was granted leave to file his third amended complaint adding allegations of fraud, wilful and wanton conduct, and conversion.

On or about December 28, 1983, plaintiff paid Skokie Federal $98,562.47 representing all principal, interest, and other charges owed on the mortgage, thereby purchasing an assignment of the note and mortgage originally given to defendant.

On November 8, 1985, the trial court, during the trial, ordered defendant to turn over the deed to the house to plaintiff. On May 23, 1986, the trial court ruled on the remaining five counts of the complaint. The trial court found that defendant breached the purchase contract because the house contained structural defects relating to improper construction and installation of the cathedral ceiling and the area over the garage ceiling, because defendant failed to follow the plans and specifications of the architect as approved by the city, and because defendant improperly refused to deliver the deed for the house to plaintiff after the loan was paid off.

The trial court also found that as the title was not delivered until December 1985, the express warranty extended until December 1986, that the implied warranty of habitability applied to plaintiff because he was a subsequent purchaser, and that defendant breached both the express and implied warranties.

The trial court next found that defendant committed fraud upon plaintiff because, despite the fact that plaintiff paid off the note and mortgage, defendant still refused to deliver or cause to be delivered to plaintiff the deed to the house until plaintiff executed a general release. Defendant, however, induced reliance by plaintiff on defendant's representations that he intended to transfer title to plaintiff in accordance with the terms of the contract, and plaintiff was substantially damaged by his reliance on defendant's representation. Addi-

tionally, the trial court, determining that reliance on misrepresentations was unnecessary to prove fraud, found that plaintiff was damaged as a result of defendant's misrepresentations that the house was structurally sound.

The trial court then found that defendant was liable for wilful and wanton conduct, stating that defendant was made aware of the structural defects pertaining to the house, failed to properly investigate them, refused to correct the defects despite the express warranty contained in the contract, failed to follow the plans filed with the city, misled Lulkin and the city about the ridge beam required to be in the living room and dining room ceiling and refused to cause a deed to be issued to plaintiff. The court found that defendant had a duty to insure that the house complied with the building codes.

The trial court determined that the measure of actual damages is the cost of repairing or rectifying the defects or complying with the omissions, and after correcting a clerical error, awarded actual damages in the amount of $51,547.08. This included the cost of repair of the cathedral ceiling, the area above the garage, and the roof, the cost to complete the list of additional items, and the cost for the new air-conditioner and insulation. The court also awarded punitive damages in the amount of plaintiff's attorney fees, later determined to be $109,544.70, and awarded the statutory rate for prejudgment interest. The trial court also dismissed defendant's counterclaim, which is not appealed, and count VI of plaintiff's third amended complaint alleging conversion.

Defendant first contends that count IV of plaintiff's third amended complaint, which alleges fraud based on the assertion that defendant had a secret intention to seek a general release prior to transferring title, is legally insufficient and should have been stricken as a matter of law. He argues that this alleged secret intention is, at best, a false statement about future intentions actionable only as a breach of contract and does not constitute fraud. Plaintiff responds that taken as a whole the complaint sets forth numerous allegations which reflect a scheme by defendant to defraud plaintiff by the use of concealments, misrepresentations, and wrongful acts. In particular, he argues that while a mere promise to do some future act cannot constitute fraud, when a false promise of future conduct is made as part of a scheme to defraud, the promise becomes fraudulent. Defendant replies, in pertinent part, that plaintiff has failed to allege, or for that matter prove, any detrimental reliance, pointing out the fact that the trial court prohibited the utilization of any concealment allegations in the fraud count because of plaintiff's inability to rely upon them to his detriment.

■ An objection may be made to the complaint at any time and by any means and for the first time on appeal if it appears as a matter of law that the complaint fails to state a cause of action. (See *Torres v. Divis* (1986), 144 Ill. App. 3d 958, 967, 494 N.E.2d 1227; *Midwest Bank & Trust Co. v. Village of Lakewood* (1983) 113 Ill. App. 3d 962, 974, 447 N.E.2d 1358; *People ex rel. Difanis v. Futia* (1978), 56 Ill. App. 3d 920, 925, 373 N.E.2d 530.) A review of the record reveals that there was no motion to dismiss below. Under section 2—612(c) of the Illinois Civil Practice Law, "[a]ll defects in pleadings, either in form or substance, not objected to in the trial court are waived." (Ill. Rev. Stat. 1985, ch. 110, par. 2—612(c).) However, an objection for the first time on appeal is allowable where the complaint wholly and absolutely fails to state a cause of action. See *Oberman v. Byrne* (1983), 112 Ill. App. 3d 155, 159, 445 N.E.2d 374; see also Ill. Ann. Stat., ch. 110, par. 2—612, Historical and Practice Notes, at 299 (Smith-Hurd 1983).

■ ■ To state a cause of action for fraud, a plaintiff must allege that a statement of material past or present fact was made, that the statement was false, that the party making the statement knew it to be or believed it to be false, that the party to whom the statement was made believed and relied upon the statement and had a right to do so, that the statement was made for the purpose of inducing the other party to act or refrain from acting, and that the reliance of the person to whom the statement was made led to this injury. (*Smith v. Jones* (1986), 113 Ill. 2d 126, 133-34, 497 N.E.2d 738; *Glazewski v. Coronet Insurance Co.* (1985), 108 Ill. 2d 243, 249, 483 N.E.2d 1263; *Redarowicz v. Ohlendorf* (1982), 92 Ill. 2d 171, 185-86, 441 N.E.2d 324.) While most jurisdictions hold a promise of future conduct, representing as it does the state of a person's mind, is regarded as a statement of material fact (see *Schnidt v. Henehan* (1986), 140 Ill. App. 3d 798, 805, 489 N.E.2d 415), Illinois courts have rejected this general rule, holding that a promise of future conduct accompanied with the present intent not to perform is not a false representation upon which an action for fraud can be based. (See *Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 334, 371 N.E.2d 634.) An exception to this general rule has been established where the fraudulent conduct is alleged to be the scheme used to accomplish the fraud. 69 Ill. 2d 320, 334, 371 N.E.2d 634; *First National Bank v. St. Charles National Bank* (1987), 152 Ill. App. 3d 923, 934, 504 N.E.2d 1257; *Schnidt v. Henehan* (1986), 140 Ill. App. 3d 798, 805, 489 N.E.2d 415; *Ronan v. Rittmueller* (1982), 105 Ill. App. 3d 200, 206-07, 434 N.E.2d 38.

■ Here, the complaint asserts that plaintiff entered into the

contract to purchase whereby defendant would deliver the deed when plaintiff paid the note and mortgage held by Skokie Federal on the property, that defendant refused to deliver the deed without plaintiff signing a general release upon plaintiff's indication of a willingness to pay off the mortgage and actual payment of the mortgage, that defendant entered into the contract with the intent not to deliver the deed without a general release, that plaintiff relied on defendant's representations that he would comply, and that plaintiff was damaged as a result of this noncompliance as he was unable to utilize the property as collateral or to transfer the property. Plaintiff argues that defendant's representation that he would deliver the deed upon plaintiff's payment of the note and mortgage falls within the exception to the general rule concerning a promise of future conduct. Had defendant raised an objection to the sufficiency of the allegations in the complaint in the trial court, plaintiff might have remedied the pleading defects now complained of for the first time on appeal. Count IV alleges a fraud as set forth above, and we cannot find that it wholly and absolutely fails to state a cause of action.

Defendant next contends that the trial court's finding of fraud was not supported by clear and convincing evidence. He argues that the only fraudulent activity alleged was the entering of the contract by defendant intending not to transfer title unless plaintiff executed a general release and that plaintiff failed to prove that defendant had a secret plan to demand a general release at a later date when he initially entered into the contract. Plaintiff responds that as the most significant evidence supporting defendant's contention that he lacked a fraudulent intent is defendant's own testimony, testimony which was often attacked and impeached, there is no credible evidence supporting defendant's protestations.

Fraud will not be presumed and must be proved by clear and convincing evidence. (*In re Application of Rosewell* (1985), 106 Ill. 2d 311, 318-19, 478 N.E.2d 343; *Hofmann v. Hofmann* (1983), 94 Ill. 2d 205, 222, 446 N.E.2d 499; *Mercado v. United Investors, Inc.* (1986), 144 Ill. App. 3d 886, 894, 494 N.E.2d 824.) Here, based on the allegations set forth in the complaint, plaintiff was required to prove by clear and convincing evidence a scheme of fraud. Defendant asserts that there was no testimony about such a scheme based upon direct knowledge, pointing out that plaintiff's case is built entirely on supposition and innuendo and that the only reasonable inference from the proved facts is that he only decided to request a general release after the dispute between the parties had matured and not prior to signing the contract. In support of his testimony below, defendant relies on the facts that he actually loaned plaintiff the money to pur-

chase the house, that he did not have any actual knowledge of any structural problems prior to July 1981, that he actually deposited the letter of transfer in escrow, that there were no disputes between the parties when the contract was initially entered into, that he was prepared to close in 1981 without any general release, and that plaintiff failed to establish any reason for him to have a scheme to defraud.

Plaintiff, however, asserts that defendant's testimony is unsupported, contradicted, and incredible. He asserts that the most significant contradiction involves the precise question of his intent concerning the deed at the time of the contract. Plaintiff argues that during defendant's deposition, defendant testified that even in 1980, he would not have turned over the title to plaintiff if he had not signed a general release. In addition, he notes that there was no document in the record that defendant ever tendered any such direction to convey the deed to plaintiff to the trustee bank, or if so, when it was withdrawn, as the complete file of the trust in question at the trustee bank contains no such direction to convey and no indication that any such direction was ever received. Plaintiff also asserts the defects proved to be in the house are indicative that defendant intended to defraud him, arguing that the knowledge of these defects required defendant, in his mind, to obtain a general release.

Defendant correctly points out that plaintiff failed to establish that defendant was perpetrating a fraud by inducing plaintiff to purchase the house with defendant intending never to relinquish the title to the house with a general release. Plaintiff only presents speculation while defendant, although contradictory in his testimony at times, clearly stated that he decided to withhold the deed until he received a general release because the parties were having trouble handling the completion of this matter. Plaintiff presented nothing to clearly and convincingly establish defendant's intent. His most persuasive evidence concerns defendant's knowledge of the defects in the house.

Plaintiff, however, contends that the trial court properly relied on defendant's misrepresentations concerning the structural integrity of the house, the hidden defects within the house, and defendant's questionable conduct throughout the entire transaction to support the claim that defendant was operating a fraudulent scheme. Plaintiff relies on *Posner v. Davis* (1979), 76 Ill. App. 3d 638, 395 N.E.2d 133, arguing that defendant concealed defects from him with the intent to obtain a general release upon closing of the sale.

In this context, defendant argues that a finding of fraud here cannot be based upon the claims of misrepresentations of structural integrity because these were not pleaded in the complaint below, be-

cause it was not proved that defendant made any express misrepresentation concerning the soundness of the structure, and because it was not demonstrated that plaintiff relied on any misrepresentations concerning the house.

■ As noted earlier, Illinois has rather strict standards which must be proved in fraud actions. (See *Mercado v. United Investors, Inc.* (1986), 144 Ill. App. 3d 886, 894, 494 N.E.2d 824.) Although the trial court found that there were misrepresentations by defendant that the house was structurally sound, the evidence does not support this conclusion. Nor were these alleged misrepresentations the basis of the fraud count. Plaintiff's reliance on *Posner* is misplaced because *Posner* involved the active concealment of a defect by a seller to insure the sale of a house. The circumstances in this case do not support a similar finding. There are no allegations, proofs, or findings that defendant made these misrepresentations about the house to induce plaintiff to purchase the house or that plaintiff relied on these. The evidence merely established that the house was not built in accordance with the plans and did not establish a scheme by defendant to trick plaintiff into signing a general release. Without more, there was no scheme of fraud demonstrated, and there is no basis in evidence to support the trial court's finding of fraud, thereby requiring the reversal of the judgment on the fraud count. While we note that the relationship of the parties gradually deteriorated during the progression of this sale, we find no support for the trial court's conclusion that the appalling nature of the progression of this entire transaction and subsequent discoveries of defects can be utilized to buttress plaintiff's fraud claim.

■ Defendant next contends that plaintiff cannot recover under the wilful and wanton count of the complaint because plaintiff's damages, if any, were solely economic and no independent tort was proved. Relying on *Morrow v. L. A. Goldschmidt Associates, Inc.* (1986), 112 Ill. 2d 87, 492 N.E.2d 181, defendant argues that plaintiff failed to allege or prove that the purported construction defects caused physical injuries or damage to other property, and that there was no independent tort upon which recovery could be had. Plaintiff, however, distinguishes *Morrow*, stating that the supreme court did not rule that "no plaintiff could recover punitive damages for wilful and wanton conduct arising out of contract," but that it only distinguished between merely economic damages and "traditional tort damages, including potential personal injury." He argues that as there was a potential for personal injury in the present situation, traditional tort damages are available.

The sole purpose of contract damages is to compensate the non-breaching party, and, therefore, as a general rule, punitive damages are not recoverable for a breach of contract, even for a wilful breach. (*Morrow v. L. A. Goldschmidt Associates, Inc.* (1986), 112 Ill. 2d 87, 94, 492 N.E.2d 181.) An exception to this general rule is when the conduct causing the breach is also a tort, that is, where the breach amounts to an independent tort and there are proper allegations of malice, wantonness, or oppression, for which punitive damages are recoverable. (112 Ill. 2d 87, 95, 492 N.E.2d 181.) While the line of demarcation between tort and contract is sometimes difficult to make, and, occasionally, the conduct complained of can constitute both a breach of contract and a tort (112 Ill. 2d 87, 96, 492 N.E.2d 181), simply characterizing a breach of contract as "wilful and wanton" does not change the fact that a plaintiff may only be seeking recovery for harm to a contract-like interest. (112 Ill. 2d 87, 98, 492 N.E.2d 181.) Illinois continues to adhere to the view that tort and contract law are founded on different policies which justify separate rules with respect to recovery of punitive damages. (112 Ill. 2d 87, 99, 492 N.E.2d 181.) Where the construction defects do not cause physical injuries or damage to other property, tort liability will not be imposed on a builder for a breach of contract with the purchaser, even if the breach was wilful and wanton. 112 Ill. 2d 87, 98, 492 N.E.2d 181.

 Here, although the trial court found that defendant was guilty of wilful and wanton misconduct, the evidence is insufficient to support this finding and the subsequent award of punitive damages. Contrary to plaintiff's assertion, there need be more than a "potential" for physical injury or damage to other property. Although the lone dissenter in *Morrow* expressed the view that the potential for injury should be sufficient to constitute wilful and wanton misconduct (112 Ill. 2d 87, 99, 492 N.E.2d 181 (Goldenhersh, J., dissenting)), the majority made it clear that there must be actual physical injury or actual damage to property to recover under a tort theory. Neither physical injury nor actual damage to other property was proved below. On the basis that the breach was wilful and wanton, the trial court improperly awarded punitive damages. The policy remains in Illinois that "[a] plaintiff seeking to recover purely economic losses due to defeated expectations of a commercial bargain cannot recover in tort." See *Anderson Electric, Inc. v. Ledbetter Erection Corp.* (1986), 115 Ill. 2d 146, 153, 503 N.E.2d 246.

Defendant also contends that the punitive damage award is excessive and improper. As we have determined that plaintiff failed to prove fraud or wilful and wanton conduct, it is unnecessary to ad-

dress the propriety of the amount of punitive damages because there was no independent tort proved below upon which punitive damages were recoverable.

■■ ■ Defendant next contends that the trial court's award of recovery for the additional air-conditioning system and additional insulation was error.

First, defendant argues that plaintiff cannot recover for either of these items under the express warranty as the time limitation of the warranty had expired. He asserts that the trial court's determination that the consummation of the agreement did not occur until December 1985, thereby extending the express warranty to December 1986, is incorrect, and he contends that the parties' agreement to withhold delivery of the deed as security for repayment of the loan merely created an "equitable mortgage" and did not operate to extend the warranty provision.

The sufficiency and proof of a cause of action for breach of an express warranty rests entirely upon the language of the warranty. (See *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 92-93, 435 N.E.2d 443.) The express warranty in the contract stated that defendant would correct any defect due to faulty construction or defective material for one year from the consummation of the contract. The consummation of the contract was expressly defined in the warranty provision as when the deed was delivered. The trial court determined that the warranty period extended until December 1986 because the deed was not delivered until December 1985, and this decision is supported by the express language of the contract. The meaning of a contract provision must be determined from the words used, and a court cannot place a construction on a provision which is contrary to the plain and obvious meaning of the language. See *Johnstowne Centre Partnership v. Chin* (1983), 99 Ill. 2d 284, 287, 458 N.E.2d 480.

■■ Under the language of this warranty, however, defendant's obligation during the one-year period of the warranty was to correct any defects. Any problems defendant was not notified of could not have been corrected by defendant prior to notification by plaintiff and, therefore, defendant cannot be held to have breached its expressed obligation as to any correction undertaken by plaintiff without notifying defendant. Plaintiff never notified defendant of the alleged insufficiencies in the air-conditioning system and insulation which appeared prior to the parties' becoming entrenched in this legal battle. Under the language of the express warranty, we find defendant cannot be held responsible for the additional air-conditioning sys-

tem and additional insulation.

Second, defendant argues that as plaintiff failed to give any notice that either of these items was inadequate or defective, plaintiff cannot now recover under a theory of a breach of the implied warranty of habitability. Defendant urges this court to adopt the approach of *Pollard v. Saxe & Yolles Development Co.* (1974), 12 Cal. 3d 374, 525 P.2d 88, 115 Cal. Rptr. 648, which determined that a notice requirement similar to section 2—607(3)(a) of the Uniform Commercial Code (UCC) (Ill. Rev. Stat. 1983, ch. 26, par. 2—607(3)(a)) applies to an implied warranty of habitability in the sale of real property, and he contends that he should have been given an opportunity to correct these problems.

To establish a cause for breach of an implied warranty of habitability involving a home, a plaintiff must prove that the home had a latent defect caused by improper design, material, or workmanship in its construction which rendered the property unsuitable for use as a home. (See *Fischer v. G&S Builders* (1986), 147 Ill. App. 3d 168, 175, 497 N.E.2d 1022, citing *Redarowicz v. Ohlendorf* (1982), 92 Ill. 2d 171, 441 N.E.2d 324.) Here, there was no evidence to establish that because of the improper duct work or the lack of insulation the house was uninhabitable or not reasonably fit for use as a residence. The evidence merely indicated that the house was uncomfortable for plaintiff's tastes.

The implied warranty of habitability, a creature of public policy (*Petersen v. Hubschman Construction Co.* (1979), 76 Ill. 2d 31, 41, 43, 389 N.E.2d 1154), is a judicial innovation that has evolved to protect purchasers of new and used houses upon discovery of latent defects in their homes. (*Redarowicz v. Ohlendorf* (1982), 92 Ill. 2d 171, 183, 441 N.E.2d 324.) While the implied warranty of habitability has roots in the execution of the contract for sale (*Petersen v. Hubschman Construction Co.* (1979), 76 Ill. 2d 31, 43, 389 N.E.2d 1154), it exists independently (76 Ill. 2d 31, 41, 389 N.E.2d 1154). In particular, the subsequent purchaser has little opportunity to inspect the construction methods used in building the home, is usually not knowledgeable in construction practices, and must, to a substantial degree, rely upon the expertise of the person who built the home. (*Redarowicz v. Ohlendorf* (1982), 92 Ill. 2d 171, 183, 441 N.E.2d 324.) If the construction of a house is defective, its repair costs should be borne by the responsible builder-vendor who created the latent defect. 92 Ill. 2d 171, 183, 441 N.E.2d 324.

The essence of these implied warranties is that the builder is responsible for correcting any defects. Here, defendant was not al-

lowed to respond to his obligation because he was not given an opportunity to correct the problem. More important, however, is the fact that plaintiff failed to establish that the house with the original air-conditioning system and insulation was not reasonably fit for use as a residence. Without such proof, the evidence is insufficient to support the trial court's decision to incorporate the corrections of the problems with the air-conditioning system and insulation into the judgment and should be reduced accordingly. Based on this decision, it is unnecessary to determine whether the notice requirements of section 2—607(3)(a) of the UCC (see Ill. Rev. Stat. 1983, ch. 26, par. 2—607(3)(a)) should be extended to an implied warranty of habitability involving the sale of property.

■■ Defendant next contends that plaintiff is barred from bringing an action for the repair of the cathedral ceiling and garage ceiling by section 13—214(a) of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 13—214(a)), as the action should have been brought within two years of the discovery of the problems. He argues that as plaintiff caused repairs to be had in August 1981, plaintiff had knowledge of the defects which triggered the running of the two-year period. He speculates that the trial court ruled against him on this issue below at the time section 13—214(a) had been declared unconstitutional (see *People ex rel. Skinner v. Hellmuth, Obata & Kassabaum, Inc.* (1985), 135 Ill. App. 3d 765, 482 N.E.2d 155, *rev'd* (1986), 114 Ill. 2d 252, 500 N.E.2d 34), which may have affected the trial court's decision. Plaintiff responds that discovery of the defects actually did not occur until 1982. In addition, the statute of limitations does not bar an action brought under the express warranty provision of the contract, citing *Stelzer v. Matthews Roofing Co.* (1986), 140 Ill. App. 3d 383, 488 N.E.2d 1293.

Section 13—214(d) excludes the application of the limitation period where the defendant has expressly warranted the improvements for a period longer than provided by statute. (Ill. Rev. Stat. 1983, ch. 110, par. 13—214(d); *Stelzer v. Matthews Roofing Co.* (1986), 140 Ill. App. 3d 383, 385, 488 N.E.2d 1293.) Therefore, it does not act as a bar to plaintiff's breach of express warranty action, which warranty ran until December 1986, one year after delivery of the deed. This lawsuit was filed on November 16, 1983. Although section 13—214(d) may bar plaintiff's action for breach of an implied warranty of habitability or breach of contract, it is unnecessary to address this issue as the evidence presented below was sufficient to sustain plaintiff's cause of action for breach of the express warranty included in the contract for the defects in the cathedral ceiling, the area above the garage ceiling,

and the attic roof.

Defendant's next contention is that the trial court erred in including in plaintiff's actual damages the fees plaintiff paid to his expert, Stuart Jacobson. Plaintiff responds that Jacobson's fees were not for testifying, but for his work prior to trial in discovering the problems. In addition, plaintiff argues that Jacobson's fees are part of making him "whole."

Defendant also contends that the trial court improperly awarded the costs for repair of the cathedral ceiling and garage ceiling when it should have, instead, awarded the diminution in value of the building which was attributable to the defect. Relying specifically on *Witty v. C. Casey Homes, Inc.* (1981), 102 Ill. App. 3d 619, 430 N.E.2d 191, he argues that the cost to repair the damages alleged would require an unreasonable destruction of the work done by defendant, would incur costs disproportionate to the results obtained, and would destroy the extensive remodeling and decorating done by plaintiff. He also maintains that adequate remedial measures have already been taken, and neither area poses anything more than an aesthetic problem because each area is now structurally safe and sound.

Plaintiff responds that the law in Illinois is when performance by the builder has been less than full performance, the measure of damages due the purchaser is the cost of repairing or rectifying the defects or completing the omissions. He argues that these damages may be awarded, as they were the proximate result of the builder's breach, and that these costs of repairs should be awarded even if they are quite large in proportion to the value of the property.

The supreme court has stated:

> "[t]he measure of damages should be the cost of correcting the defective conditions. If, however, the defects could be corrected only at a cost unreasonably disproportionate to the benefit to the purchaser, or if correcting them would entail unreasonable destruction of the builder's work, the amount by which the defects have reduced the value of the property should be the measure of damages." (*Park v. Sohn* (1982), 89 Ill. 2d 453, 464-65, 433 N.E.2d 651.)

(See *Petersen v. Hubschman Construction Co.* (1979), 76 Ill. 2d 31, 39-40, 389 N.E.2d 1154.) This has been followed often. (See, *e.g., Nisbet v. Yelnick* (1984), 124 Ill. App. 3d 466, 470, 464 N.E.2d 781; *Rosos Litho Supply Corp. v. Hansen* (1984), 123 Ill. App. 3d 290, 295-96, 462 N.E.2d 566; *Witty v. C. Casey Homes, Inc.* (1981), 102 Ill. App. 3d 619, 624-25, 430 N.E.2d 191.) In addition, in the absence of statutory authority, experts' fees are not taxable as costs. See *In re Estate*

*of James* (1956), 10 Ill. App. 2d 232, 134 N.E.2d 638; see. also *Hutchinson v. Hutchinson* (1894), 152 Ill. 347, 38 N.E. 926.

A person breaching a contract can be held liable for such damages as may fairly and reasonably be considered as naturally arising from the breach thereof in light of the facts known or which should have been known or such as may reasonably be supposed to have been within the contemplation of the parties as a probable result of a breach thereof. (*Case Prestressing Corp. v. Chicago College of Osteopathic Medicine* (1983), 118 Ill. App. 3d 782, 788, 455 N.E.2d 811.) When a contract is breached the injured party is, insofar as it is possible. to do so by a monetary award, entitled to be placed in the position he would have been in had the contract been performed. (118 Ill. App. 3d 782, 788, 455 N.E.2d 811.) The parties agree that generally the measure of damages in the case of a breach of warranty is the cost of repair. (See *Briarcliffe West Townhouse Owners Association v. Wiseman Construction Co.* (1985), 134 Ill. App. 3d 402, 411, 480 N.E.2d 833.) As the party seeking to recover, it is the plaintiff's burden not only to establish that it sustained damages but also to establish a reasonable basis for computation of those damages. (See *First National Bank v. Shape Magnetronics, Inc.* (1985), 135 Ill. App. 3d 288, 293, 481 N.E.2d 953; *Schoeneweis v. Herrin* (1982), 110 Ill. App. 3d 800, 808, 443 N.E.2d 36.) Moreover, this court will not disturb the trial court's findings as to damages unless those findings are against the manifest weight of the evidence. *Briarcliffe West Townhouse Owners Association v. Wiseman Construction Co.* (1985), 134 Ill. App. 3d 402, 411, 480 N.E.2d 833.

■■■ A review of the repair costs, however, indicates that they are substantially lower, even as presented in the trial court's original order, than the entire value of the house, and there is no evidence that effecting repairs would extensively damage the house. As such, defendant's reliance on isolated language in *Witty v. C. Casey Homes, Inc.* (1981), 102 Ill. App. 3d 619, 430 N.E.2d 191, is inapposite, and the trial court's use of the repair costs as a basis for fashioning damages is not erroneous.

Defendant contends that the trial court improperly included as actual damages $4,693.50 for Stuart Jacobson's fees for structural engineering services. He argues that there was no evidence presented to support the claim that these fees were incurred for remedial work on the house. Plaintiff responds that most of the bills were incurred prior to trial and were properly awarded both as expenses for remedial action to satisfy an injured party and as costs.

■■■ ■ First, plaintiff incorrectly argues that some of the fees

sought were properly awarded as costs. Costs are allowances in the nature of incidental damages awarded by law to reimburse the prevailing party, to some extent, for the expenses necessarily incurred in the assertion of his rights in court. (*Galowich v. Beech Aircraft Corp.* (1982), 92 Ill. 2d 157, 165-66, 441 N.E.2d 318.) A successful litigant, however, is not entitled to recover the ordinary expenses of litigation and trial preparation, and only those items designated by statute to be allowable can be taxed as costs. (92 Ill. 2d 157, 166, 441 N.E.2d 318; *Meyer v. Marshall* (1976), 62 Ill. 2d 435, 442, 343 N.E.2d 479.) Plaintiff has not presented any statutory authority to support the award for Jacobson's fees as costs.

■■■ In addition, only those fees incurred in the repair of the house fall within plaintiff's actual damages. Therefore, only the bills which relate to the discovery of the defects in the house and the repair of these defects are recoverable. (See *Case Prestressing Corp. v. Chicago College of Osteopathic Medicine* (1983), 118 Ill. App. 3d 782, 788, 455 N.E.2d 811.) The general rule in contract actions is that damages are appropriate to place the aggrieved party in the position he would have been in had the contract been performed. (*Illiana Machine & Manufacturing Corp. v. Duro-Chrome Corp.* (1987), 152 Ill. App. 3d 764, 768, 504 N.E.2d 974.) From our examination of Jacobson's bills, it is clear that most of the bills were in connection with Jacobson's consultation during the negotiations to resolve the matter prior to trial and were incurred in the preparation and presentation of Jacobson's trial testimony, and plaintiff is not entitled to these fees to be included as costs or actual damages. The bills submitted below indicate that only the August 6, 1982, bill for the inspection of the house and the report indicating discovery of the defects and the nature of the necessary repairs fall within this category of actual damages.

As such, the trial court's inclusion as actual damages bills for services other than the August 6, 1982, bill of $425 is against the manifest weight of the evidence and is vacated.

■■■ ■ Plaintiff, in his cross-appeal, contends that the trial court erred when it dismissed the conversion count of the complaint. Stating that the facts are undisputed, he argues that he pleaded and proved that, not only did defendant refuse to convey the deed after plaintiff had paid him all the money due defendant under the contract, nearly $200,000, but also defendant continued to refuse to transfer the deed even after the entire outstanding balance on the mortgage had been paid, and, instead, intentionally deeded it to defendant's secretary.

Defendant responds that plaintiff did not prove conversion be-

cause he failed both to identify the actual chattel converted and to determine when he was entitled to possession. He argues that not only was the mortgage not paid off on December 29, 1985, but merely purchased by plaintiff, but also that plaintiff did not make this purchase until after trial began below. In addition, he argues that the trial court's ruling clearly indicates that the deed was ordered to be delivered concurrently with the cancellation of the mortgage.

The supreme court, quoting Dean Prosser, stated that "[c]onversion is an intentional exercise of dominion or control over a *chattel* which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other full value of the chattel." (Emphasis added.) (*In re Thebus* (1985), 108 Ill. 2d 255, 259, 483 N.E.2d 1258.) The essence of conversion is the wrongful deprivation of one who has a *right to the immediate possession* of the object unlawfully held. (108 Ill. 2d 255, 259, 483 N.E.2d 1258; *Andrews v. Mid-America Bank & Trust Co.* (1987), 152 Ill. App. 3d 139, 142, 503 N.E.2d 1120.) The elements of conversion are (1) unauthorized and wrongful assumption of control or ownership by one person over the personalty of another; (2) the other person's right in the property; (3) the right to immediate possession of the property; and (4) a demand for possession. 152 Ill. App. 3d 139, 142, 503 N.E.2d 1120; *A. T. Kearney, Inc. v. INCA International, Inc.* (1985), 132 Ill. App. 3d 655, 664, 477 N.E.2d 1326; *Scheduling Corp. of America v. Massello* (1983), 119 Ill. App. 3d 355, 359, 456 N.E.2d 298.

■■■ Initially, the authority relied on by plaintiff to support his contention that one may convert real estate is tenuous. *Hayes v. Massachusetts Mutual Life Insurance Co.* (1888), 125 Ill. 626, 18 N.E. 322, mentions that "trover will lie for the wrongful conversion *** of title to real or personal property." (125 Ill. 626, 633, 18 N.E. 322.) Since then, the supreme court has stated that "[i]t is ordinarily held, however, that an action for conversion lies only for personal property which is tangible, or at least represented by or connected with something tangible." (*In re Thebus* (1985), 108 Ill. 2d 255, 260, 483 N.E.2d 1258.) Other cases merely refer to chattels or personal property when discussing the elements of conversion. (See *Andrews v. Mid-America Bank & Trust Co.* (1987), 152 Ill. App. 3d 139, 142, 503 N.E.2d 1120; *A. T. Kearney, Inc. v. INCA International, Inc.* (1985), 132 Ill. App. 3d 655, 664, 477 N.E.2d 1326; *Scheduling Corp. of America v. Massello* (1983), 119 Ill. App. 3d 355, 359, 456 N.E.2d 298.) An action for conversion is not the appropriate method of obtaining title to real property alleged to be wrongfully held pursuant to a contract provision.

For the foregoing reasons, the findings of the trial court of fraud and wilful and wanton misconduct and the judgment for punitive damages based thereon are reversed, the award of damages for the breach of the express warranty for the defect in the cathedral ceiling, the area above the garage ceiling, and the roof above the attic is affirmed, the award of damages for the air-conditioning and insulation is vacated, and the award of fees for Jacobson's services is reduced to $425. On this basis, we find that the actual damage award due plaintiff from defendant is $41,092.83.

Affirmed in part; reversed in part.

UNVERZAGT and WOODWARD, JJ., concur.